# SUPREME COURT.

## The Johnston Harvester Company agt. Peter Meinhardt and others.

*Injunction — " Rights of trades unions " — When injunction against will not be granted — The court cannot go beyond preventing breaches of the peace.*

The orderly and peaceable assembling or co-operation of persons employed in any profession, trade or handicraft for the purpose of securing an advance in the rate of wages or compensation, or for the maintenance of such right, is now permitted by statute (*Chapter* 19, *Laws of* 1870).

This statute does not, however, permit an association or trades union, so-called, or any body of men in the aggregate, to do any act which each one of such persons in his individual capacity and acting independently had not a right to do before the act was passed.

This act does not shield a person from liability for his action in intimidating or coercing a fellow-laborer so that he shall leave his employer's service. Such conduct is, in its nature, a trespass upon the rights of business of the employer.

If he compels by assault or violence, by threats, by acts of coercion, a fellow-craftsman to leave the employ of another, he commits an offense against the rights of such person which is hardly distinguishable from an act which should itself injure or destroy the product of that man's labor. It is a direct injury to property rights and may be regarded as the sole proximate cause of such injury, for the laborer in such cases has not freedom of action and cannot himself be deemed to take any part in the transaction.

On a motion in behalf of plaintiff for an injunction against the defendants, who are members of a trades union known as the "Iron Moulders' Union," to restrain them from interfering with the business of the plaintiff, or intermeddling with any person in the employ, or anyone with whom the plaintiff is negotiating to enter into such employment, the facts showed a combination of the defendants and an enticement by them of laborers from the plaintiff's shops, and others who were about to enter the employ of the plaintiff, by means of arguments, persuasion and personal appeals, accompanied by payment of traveling expenses to other localities:

*Held,* that the laws of this state do not permit an injunction to be granted for such a cause.

There being no sufficient evidence of violence, force or intimidation or coercion on the part of the defendants against the plaintiff's laborers,

Johnston Harvester Company agt. Meinhardt.

the position that a confederation of persons to entice away workmen or servants from the plaintiff's employ is an unlawful act, and may be restrained by injunction is untenable.

Although it is the duty of courts and of peace officers to see to it that such controversy shall not result in breaches of the peace, or in such acts as may tend to breaches of the peace, and to hold alike the employer and the employed to the payment of damages for any violation of contract, and to responsibility for any acts which immediately and in a legal sense affect the rights of either, yet the court cannot go beyond preventing breaches of the peace.

*Monroe Special Term, November*, 1880.

THIS is a motion in behalf of the plaintiff for an injunction against the defendants, to restrain them from interfering with the business of the plaintiff, or intermeddling with any person in the employ of the plaintiff, or who is about to enter into its employ, or any one with whom the plaintiff is negotiating to enter into such an employment.

*Mr. Cogswell*, for plaintiff.

*Mr. Cochrane* and *D. A. Adams*, for defendants.

MACOMBER, *J.*— It appears from the complaint that the plaintiff is a business corporation engaged extensively in the manufacture of agricultural implements, at the village of Brockport, in this state; that in such business a large number of iron moulders is required; that all, or nearly all, of the defendants were formerly, and up to the 2d of October, 1880, at service for the plaintiff as iron moulders; that on the said second day of October all of the iron moulders except four left the plaintiff's employ, for the ostensible reason that the plaintiff did not pay sufficiently high wages. The complaint further alleges that the defendants are members of an association known as the "Iron Moulders' Union," and "that they have combined and confederated together to prevent the plaintiff from supplying the places of the iron moulders who

have so left its employment, and to prevent iron moulders whom the plaintiff had hired, or was about to hire, from entering into the plaintiff's employ, unless said plaintiff would pay the scale of wages prescribed by said "Iron Moulders' Union" and submit to the other requirements thereof; that among such requirements is this: "that said plaintiff would discharge all persons from its employ as iron moulders who were not members of such union; and that said defendants have combined and confederated together to interfere with and prevent the said plaintiff carrying on its said business."

The complaint further states that, in pursuance of such combination and confederacy, the defendants have interfered with and prevented persons from hiring to the plaintiff, and that this was done "sometimes by intimidation and abuse, sometimes by persuasion, and sometimes by offering pecuniary reward;" that the said defendants have also, in pursuance of such unlawful combination and confederacy, and by like unlawful means and inducement, induced many persons who had entered into the employment of the said plaintiff as iron moulders, to leave and abandon the same.

Thence follow allegations to the effect that such acts have been repeated from day to day, and that the defendants threaten to, and the plaintiff believes that they will, continue the same daily, and even hourly, unless the plaintiff yields to their demands or the court interferes, and that the damage to the plaintiff, if such acts are continued to be permitted, will be irreparable. These allegations are amplified by the affidavits in support of the motion, which show that in repeated instances the defendants, or some of them, have induced persons to leave the plaintiff's employ, and others who were about to enter into such employment to desist from so doing, and have paid them money therefor, for the purpose of paying their passage to their homes and elsewhere. There is no fact shown which would, in any legal sense, amount to an intimidation of the persons who were actually in or who were about to enter the employ of the plaintiff, and no facts show-

ing acts of the defendants which would, in any legal sense, amount to a coercion of any such persons. There are affidavits showing that some of the defendants have been guilty of intemperate language, and have abused by word certain persons, and among them Arthur Elliott, a constable of the town of Sweden, who has interested himself in behalf of the plaintiff, in the protection, as he calls it, of the new moulders who had come to Brockport.

The opposing affidavits, read in behalf of the defendants, while they do not deny that the defendants have, by persuasion, induced moulders to leave the plaintiff's employ and have, by like means, induced others not to enter it, deny, fully and unequivocally, all imputations of acts of violence or intimidation charged against them in the complaint.

It further appears that the "strike" mentioned in the moving papers, was preceded by an order of the plaintiff reducing the wages or compensation of this class of laborers; also, that the moulders, then and since in the employ of the plaintiff, had not contracted their services to the plaintiff for any length of time, but that on the contrary they were at work by the day or by the piece.

"The orderly and peaceable assembling or co-operation of persons employed in any profession, trade or handicraft, for the purpose of securing an advance in the rate of wages or compensation, or for the maintenance of such right" is now permitted by statute (*Chapter* 19, *Laws of* 1870).

This statute does not, however, permit an association or trades union, so-called, or any body of men in the aggregate to do any act which each one of such persons in his individual capacity and acting independently had not a right to do before the act was passed. This act does not shield a person from liability for his action in intimidating or coercing a fellow-laborer so that he shall leave his employer's service. Such conduct is, in its nature, a trespass upon the rights of business of the employer. If he compels, by assault or violence, by threats, by acts of coercion, a fellow-craftsman to leave the employ of

another, he commits an offense against the rights of such person which is hardly distinguishable from an act which should itself injure or destroy the product of that man's labor. It is a direct injury to property rights, and may be regarded as the sole proximate cause of such injury, for the laborer, in such cases, has not freedom of action, and cannot, himself, be deemed to take any voluntary part in the transaction. For instance, in the case of *Woodward* agt. *Washburn* (3 *Denio*, 369), the action was for the loss of service of one Welcome W. Smith, the plaintiff's hired man, caused by the defendant detaining him in the Bank of Syracuse. The court held that the action was maintainable upon the principle of the common law, that when a person sustains a loss or damage by the wrong of another, he may have an action upon the case to be remunerated in damages.

A distinction has been sought to be made between cases when there was an unexpired time contract, and cases where the services were by the day or by the piece; but I do not think that such distinction rests upon any sound reason, because in cases of piece work or day work, there would remain for the court or the jury to decide whether, in point of fact, the service would have been continued even though it was not provided for by contract, and even though the employer had the right to dismiss the employe and the employe had the right to quit the service of his employer at any time when he saw fit (*Gunter* agt. *Astor*, 4 *J. B. Moore*, 12; *Benton* agt. *Pratt*, 2 *Wend.*, 385). In such a case the injury to the property and business of the employer would not consist so much in breaking the contract which existed, as in the loss of profits derived from the work of the laborer if he continued in the employment, and the probability or certainty of such loss would be, in each case, a question of fact.

There being in this case, no sufficient evidence of violence, force, intimidation or coercion on the part of the defendants against the plaintiff's laborers, the learned counsel for the plaintiff is forced to and does take the position that a confedera-

tion of persons to entice away workmen or servants from the plaintiff's employ is an unlawful act, and may be restrained by injunction. The facts before me clearly show a combination of the defendants, and an enticement by them of laborers from the plaintiff's shops, and others who were about to enter the employ of the plaintiff, by means of arguments, persuasion and personal appeals, accompanied by payment of traveling expenses to other localities. If, therefore, the laws of this state permit an injunction to be granted for such a cause, a proper case is made out for it upon this motion.

I assume, without discussing it, that if acts of this description are unlawful and actionable by common-law process, that a confederacy or a joint and concerted action on the part of a number, persistent, continuous and threatening to continue, would be a proper subject of relief in a court of equity, and would be restrained by injunction.

The case of *Lumley* agt. *Gye* (2 *El. & B.*, 216) holds that an action lies for maliciously procuring a contract to give exclusive personal service for a time certain, equally when the employment has commenced, or is about to be commenced, provided the procurement be during the subsistence of the contract and produce damage; and that to sustain such an action it is not necessary that the employer and employed should stand in the strict relation of master and servant.

In that action, the plaintiff had secured the services of Johanna Wagner, an opera singer, to perform in his theater for a certain time, with a condition, amongst others, that she should not sing or use her talents elsewhere during the term, without plaintiff's consent in writing. The defendant, knowing such to be the fact, enticed and procured the opera singer to refuse to perform, and she did not perform or sing for the plaintiff during the term.

CROMPTON, J., says: "Whatever may have been the origin or foundation of the law as to enticing of servants, and whether it be, as contended by the plaintiff, an instance and breach of a wider rule, or whether it be, as contended by the defendant,

an anomaly and exception from the general rule of law on such subjects, it must now be considered clear law that a person who wrongfully and maliciously, or, which is the same thing, with notice, interrupts the relation subsisting between master and servant, by procuring the servant to depart from the master's service, or by harboring or keeping him as servant after he has quitted it, and during the time stipulated for as the period of service, whereby the master is injured, commits a wrong act for which he is responsible at law.

In *Walker* agt. *Cronin* (107 *Mass.*, 555) it was held that an action of tort may be maintained upon a count which alleges that the plaintiff was a manufacturer of shoes, and for the prosecution of his business it was necessary for him to employ many shoemakers; that the defendant, well knowing this, did unlawfully and without justifiable cause, molest him in carrying on said business, with the unlawful purpose of preventing him from carrying it on, and willfully induced many shoemakers who were in his employment, and others who were about to enter it, to abandon it without his consent and against his will. So, also, the case of *Hart* agt. *Aldridge*, (*Cowp.*, 54), and *Gunter* agt. *Astor* (4 *J. B. Moore*, 12).

Many other cases might be cited, but these will suffice to show that elsewhere than in this state, an action may be maintained for enticing from the employment of a party, laborers who are not of a class of domestic servants.

In this state it was held, in the year 1835, in the case of the *People* agt. *Fisher* (14 *Wend.*, 9) that a conspiracy of journeymen workmen of any trade or handicraft, to raise their wages by entering into combinations to coerce journeymen and master workmen employed in the same trade or business, to conform to rules established by such combination for the purpose of regulating the price of labor, and carrying such rates into effect by over acts, is indictable as a misdemeanor. In that case it appeared that the coercion consisted only of pains and penalties which the defendants had imposed upon one of their number for violating the rules of

Johnston Harvester Company agt. Meinhardt.

their association, and their refusal to work for a manufacturer who had employed that person contrary to their wishes. That case can no longer be deemed to be the law of this state, since the passage of the act of 1870, already quoted, for ,the persons there indicted seem to have been guilty only of peaceable co-operation for the purpose of maintaining the rate of wages.   Can the effect of this statute be avoided by resorting to the common law-action for enticing away servants?   Under the facts shown in this case, whatever may be the proofs when the case comes on for trial, I think the plaintiff is not entitled to an injunction upon that theory.

In *Haight* agt. *Bagley* (15 *Barb.*, 499) it was intimated by the court that the law in regard to enticing a servant may have had its origin in English statutes; and though the court seemed to think that the English cases had not been overruled in this country, yet in the case then in hand, the court was quite careful to put its decision wholly upon the ground that the gravamen of the action was the trespass upon the plaintiff's premises, and that the enticement by words of persuasion was mere matter of aggravation of damages.

The case of *Smith* agt. *Lyke* (15 *Hun*, 204), which was an action to recover damages for enticing away the plaintiff's wife, it was held that the good faith of the defendant was involved, and that if he acted honestly, though mistakenly, there could be no recovery.

As is well known, the origin of this kind of actions was at a time of the substantial enslavement of domestic servants, and at the outset it proceeded upon the theory that such servant had not freedom of action which is conceded to that class at the present day ; yet, in one way or another, the doctrine has been extended, as has been shown above, not only in England, but in parts of the United States, to cases which in its inception it did not cover.   I am disinclined to extend, by any judgment of mine, the doctrine of recovery for enticing away servants where, both in fact and theory, the person enticed is a free agent to come and go as he will, responsible

only, like other persons, for the violation of his contract or his duty.

The controversy between capital and labor has been constant, differing only in intensity, from time to time, for at least five centuries in English history. The statute of Edward III, known as the statute of laborers, in the year 1349, was coarse and brutal in its provisions, and was designed to meet coarse and brutalized conditions of society, which followed immediately upon the ravages of the plague. English legislation since then has tended to bring about a better condition of affairs between capital and labor.

The object of many acts passed in the present century was to fix the price of labor, not only beyond the control of the laborer himself, but also beyond the control of the employer; with what measure of success it is not necessary for me here to say. But I apprehend that the course of legislation upon that subject in this state has been wiser, and with a more full and accurate knowledge of the laws of political economy. Indeed, it would seem that the wisest rule of political economy would demand that there should be no legislation upon this subject beyond preserving both employer and employed against violence and breaches of the peace, or acts in the nature of trespass, which have a tendency to bring about breaches of the peace.

The fact that there are vast accumulations of capital directed towards the development of the resources of nature and of trade in this country, having all the advantages of aggregated wealth, would probably, if not certainly, have a tendency to induce laborers also to combine for their own protection. Capital would seek to obtain the cheapest labor, and, unless resisted by something more than the old methods before the breakdown of ancient industrial systems, would almost inevitably succeed in disturbing its relationship to labor, to the detriment of the community. It is, I think, for such reasons that trades unions were organized, and for such reason is it, if at all, that their policy can, on principles of

political economy, be recognized and sustained. The combination of workingmen undoubtedly permits of more prolonged contests with capital than formerly; but capital, by combination also, threatened to be stronger than before. It is by combination in trades unions that laborers possess and exercise some control over the wages and the hours of labor; and we have the authority of T. E. Cliff-Leslie, professor of jurisprudence and political economy, Queen's University, for saying that " It would be nearer the truth to say that trades unionism tends to prevent disputes with the employer, rather than to make the common allegation that it promotes them."

The fact was shown in evidence before the British royal commission on trades unions, which reported in 1869, that there had been fewer disputes with employers, and greater permanence in the rate of wages, in the trades with the strongest and richest and most extended unions.

Undoubtedly if capitalists and laborers could truly see wherein their welfare respectively lies, it would be found that there was an inter-dependence between them, and that what was for the permanent and substantial good of either would, in the long run, be for the benefit of both. But, in the language of Mr. Goldwin Smith: "The laborer may be forgiven if he fails fully to understand that, though he receives his wages from the hand of the master, his real employer is the community, which will refuse, and cannot possibly be compelled, to give a higher price for the product of his labor than it can afford; that he, as a member of the community and an employer in his turn, offers for every product of labor which he purchases the market price and no more; and that if he persists in acting on the opposite principle where his own work is concerned, instead of enforcing an exceptional privilege, he will ruin his own trade " (30 *Contp. Review*, 531).

Yet, that the controversy will go on admits of no doubt. The direction of capital will be turned by the resistance of labor, and labor be turned by the exactions of capital, for

both, under a well recognized law of political economy, will run on the lines of the least resistance. It is the duty of courts and of peace officers to see to it that such controversy shall not result in breaches of the peace, or in such acts as may tend to breaches of the peace, and to hold alike the employer and the employed to the payment of damages for any violation of contract, and to responsibility for any acts which immediately and in a legal sense affect the rights of either. Beyond that I am not disposed to go, because that is as far as the case presents judicial questions. Further than this, let the law of supply and demand govern the parties. The field open to either is wide.

The motion for an injunction during the pendency of the action is denied, with ten dollars costs.