### ROGERS et al. v. EVARTS et al.

*(Supreme Court, Special Term, Broome County.* December 5, 1891.)

1. INJUNCTION—WHEN LIES—ENCOURAGING STRIKERS.
    An injunction will not lie to restrain the publishers of a newspaper from advising and encouraging persons in the employ of others to violate their contract of employment, on the ground that the common law forbids the enticement of a servant from the employ of his master.

2. SAME—RIGHT TO INJUNCTION—CONSTRUCTION OF STATUTE.
    Pen. Code, § 170, providing that the peaceable co-operation of handicraftsmen for the purpose of obtaining an advance in wages shall not be deemed a conspiracy, does not affect the right of the employer to maintain an action to restrain such persons from persuading his employes to leave his service.

3. SAME—RIGHTS OF STRIKERS.
    An injunction will not lie to restrain handicraftsmen from combining, and peaceably and without intimidation persuading their fellow-workmen to leave the service of their employers, in order to compel an advance in wages, on the ground that such persuasion invades the constitutional right of the employer to prosecute his business free from unlawful obstruction.

4. SAME—PAYING EXPENSES OF STRIKERS—POSTING NAMES OF CONTRIBUTORS.
    A body of handicraftsmen, combining for the purpose of peaceably and without intimidation persuading their fellow-craftsmen to leave their employment in order to obtain an advance in wages, may lawfully pay the expenses of those who leave, and post in their place of assembly the names of such persons as have contributed to the fund for the support of those who have surrendered their wages.

Action by George T. Rogers and others against James F. Evarts and others to restrain defendants from advising, aiding, and encouraging others to leave plaintiffs' employment. The complaint was dismissed on the trial.

This action is brought to restrain the defendants from doing certain acts claimed by the plaintiffs to be unlawful and injurious. The following facts were conceded upon the trial;

*First.* That these plaintiffs were the proprietors of a cigar manufactory in the city of Binghamton.

*Second.* That upon June 17, 1890, there was a general strike among the cigar-makers in the city of Binghamton, which strike included from 1,500 to 3,000 persons; that among these cigar-makers were two branches of the International Cigar-Makers' Union,—one branch No. 218, and the other branch

No. 16; that of these strikers about 150 were members of one or the other of the branches of the International Cigar-Makers' Union.

*Third.* That all of these defendants, except Cornelius F. McCormick, Margaret Carl, Owen J. Coughlin, Charles Wentzler, James E. Hireen, and Mary E. J. Kelly, were striking cigar-makers; and that the persons excepted were connected with the Binghamton Leader, a paper published in the city of Binghamton; and it is conceded upon the trial that for the purposes of this action they will be held responsible for whatever appeared in the said paper during the pendency of the strike.

*Fourth.* That these strikers came together and appointed a general strike committee, who should have charge of the strike. That under the directions of this general strike committee men and women were appointed, who were denominated "pickets," whose duties were to watch the different factories for the purpose of ascertaining what persons were at work at those factories, which duties the said pickets performed, and by the consent and authority of the general strike committee these pickets used arguments with those persons who were working in the different factories, both with the persons who remained and did not originally strike and with the other persons who were employed by the plaintiffs to take their places. That the arguments used were, in substance, that they were not getting sufficient wages for their work, and that, if the employes would come out and go upon the strike, the manufacturers would be forced to give larger wages for work that was done by them, and that thereby the strike would be made effectual.

*Fifth.* That certain of the persons who were employed to take the places of those striking were approached and told by the defendants (except those connected with the publication of the Leader) that if they would stop work they would be made whole for their expenses, and they would be paid their fare home. This offer was made to them in connection with the same arguments which are above stated, used to induce said employes to stop work at the factories.

*Sixth.* That the committee from these strikers solicited contributions from different merchants in town. From some they received contributions and from others they did not. That in their halls, where their public meetings were held, they posted up the names of merchants who had aided them by contributions, and they also posted up the names of those merchants who had refused, upon their solicitation, to aid them by contribution.

*Seventh.* That the fund raised by such solicitation was for the relief of those who were on the strike, who were in need of it, and who had not the means upon which to live, and for the purposes for which it has been heretofore stated that funds were used.

*Eighth.* That these strikers organized and held public meetings, and they appointed a general committee to take charge of the strike, which was called the "strike committee." That that committee was composed of different persons who were engaged in the strike, together with ten representatives,— five from each branch of this International Cigar-Makers' Union. The committee consisted of 30 members.

*Ninth.* That wherever in the city it was supposed that any striker was going back to work, or wherever any person who was employed in the factories was met in the city, these defendants used the same arguments with them that were admitted to have been used by the pickets, which arguments have been heretofore stated.

*Tenth.* That, wherever the defendants could find any one whom the plaintiffs were about to employ at the reduced rate of wages which they were receiving when they struck, they approached such person, and endeavored to induce him not to enter the plaintiffs' employ by the use of the same arguments which have been heretofore stated; and that such inducements and arguments

were made in pursuance of the general plan of the strikers that they would accomplish their purpose by reason of such inducements and such arguments.

*Eleventh.* That by reason of such inducements and such arguments from defendants certain of the employes of plaintiffs' factory were induced to leave plaintiffs' employment, and certain other persons were induced not to enter the employment of the plaintiffs, and certain new men employed to take the places of the strikers were induced to leave plaintiffs' employment.

*Twelfth.* That the strike began upon the 17th day of June, 1890, and continued until the 5th day of October, 1890.

*Thirteenth.* That this strike was of the employes, or of many of the employes, of all the different cigar manufactories, or of about 15 of the leading cigar manufactories, of the city of Binghamton, and had reference to all of them, as well as to the plaintiffs.

*Fourteenth.* That at the time of the strike the cigar-makers were being paid 25 cents for rolling and 12 cents for bunch-making. The demand, which was refused, was to be paid 30 cents for rolling and 15 cents for bunch-making. Prior to January 1, 1889, the workmen in the several factories had received 30 cents for rolling. The purpose of the strike was to enforce this demand.

*Fifteenth.* That the employes who originally struck were working by the piece for these plaintiffs and other manufacturers, and that there was no definite contract by which they were to remain any specific length of time.

Further facts appear in the opinion.

*Edmund O'Connor, A. D. Wales,* and *Alexander Cummings,* for plaintiffs. *George B. Curtiss* and *Tracy C. Becker,* for defendants.

SMITH, J. The complaint in the action alleges that after the defendants had entered upon the strike, and others had been employed to take their places, in the plaintiffs' factory, the defendants coerced and induced the said new employes to leave the plaintiffs' employ by threats, violence, intimidation, and persuasion. Upon the trial the defendants' counsel admitted that it was a violation of law to induce a servant to leave his master's employment, or to induce workmen to refrain from entering into employment, by means of any threat or violence; and it was further conceded by the defendants' counsel that it was a violation of law for strikers to assemble before a manufactory in such numbers as to intimidate those who were working therein. Upon the making of these concessions by the defendants' counsel, plaintiffs' counsel, at the suggestion of the court, refrained from offering any evidence to sustain such allegations of their complaint.

The plaintiffs' right to an injunction herein, upon the concessions and upon the evidence, must, as against the striking cigar-makers, stand upon one of two grounds: *First.* That the plaintiffs have such a right to the service of those in their employment that any enticement therefrom is a legal violation of such right. *Second.* That plaintiffs had the right to perfect freedom in the management of their business, which included the right to procure service for such price as they might choose to pay, and as might secure to them such service, without obstruction by defendants; and that the defendants' acts constituted an illegal trespass upon this right. As against the defendants who are connected with the publication of the Leader, the plaintiffs' right to an injunction must rest upon the fact that they have encouraged and abetted some illegal act of the strikers.

1. Does the common-law liability for enticing away a servant authorize the relief sought? By the concessions in the case, the defendants, either by themselves or by their agents, have persuaded to leave the plaintiffs' employ both servants who were working for the plaintiffs at the time of the strike and also men who were employed by the plaintiffs to take the places of those

striking. In Wood's Master & Servant, at section 230, it is said: "It is well settled that any person who knowingly entices away the servant of another, and thereby entices him to violate his contract with his master, or who thereby deprives the master of the services of one then actually in his employ, whether under contract to serve or not, is liable to the master for his actual loss therefrom." At section 231 it is said: "If a contract to serve is established, actual service under the contract need not be shown. It is enough to show that the defendant, with notice of the servant's contract obligation to the plaintiff, has persuaded him not to enter into the plaintiff's service under it." These principles of law are supported by many authorities, English and American. *Lumley* v. *Gye*, 2 El. & Bl. 216; *Milburne* v. *Byrne*, 1 Cranch, C. C. 239; *Jones* v. *Blocker*, 43 Ga. 331; *Salter* v. *Howard*, Id. 601; *Keane* v. *Boycott*, 2 H. Bl. 512; *Sykes* v. *Dixon*, 9 Adol. & El. 693: *Hartley* v. *Cummings*, 5 C. B. 247: *Pilkington* v. *Scott*, 15 Mees. & W. 657; *Walker* v. *Cronin*, 107 Mass. 555; *Carew* v. *Rutherford*, 106 Mass. 1–10; *Gunter* v. *Astor*, 4 J. B. More, 12; *Bowen* v. *Hall*, 6 Q. B. Div. 333; *Bixby* v. *Dunlap*, 56 N. H. 456; *Haskins* v. *Royster*, 70 N. C. 601; *Jones* v. *Blocker*, 43 Ga. 331; *Dickson* v. *Dickson*, 33 La. Ann. 1261. But this doctrine, although never overruled, has never, to my knowledge, been explicitly held in the courts of this state. I am not satisfied with the reason of the rule. In the case of no other contract does a man render himself liable as for tort by inducing its violation by persuasion. I can see no reason why the contract of service should be made an exception. The servant is the equal in law of the master. He contracts with the master upon equal footing. Under the old common law, the servant's position was quite different. His position was more that of a slave. With the advance in civilization the reason for the rule has entirely passed away. It is, at least, a matter of grave doubt whether such right of action will ever be sustained in this state. An injunction is an extraordinary remedy. It should not be granted in cases of doubtful right; and the plaintiffs' prayer must be denied unless they can establish their right within some other rule of law. See *Harvester Co.* v. *Meinhardt*, 9 Abb. N. C. 393; Cooley, Torts, p. 280.

2. Assume that plaintiffs' business is their property; that by the constitution they are guarantied absolute liberty in the prosecution thereof, free from unlawful obstruction. What is unlawful obstruction? It has been conceded by defendants' counsel that the enticement of plaintiffs' employes by violence, threats, or intimidation is a violation of law. The defendants concede that they induced employes to leave plaintiffs' employment by persuasion and entreaty. Did this constitute an unlawful interference with plaintiffs' rights? I cannot see that the act of 1870, or section 170 of the Penal Code, has any bearing upon this action. The purport of the act is simply a limitation of criminal liability. It cannot take from the plaintiffs any civil rights. No statute of this state is cited which abridges any civil right which plaintiffs may have under the common law. The statute, however, did not, nor does the Code now, limit criminal liability, except for a combination to increase wages, which had theretofore been held criminal. If the means employed involves trespass upon any of plaintiffs' legal rights, then the co-operation ceases to be orderly, and the statute or section of the Code becomes inoperative. In *Walker* v. *Cronin*, 107 Mass. 564, the court say: "Every one has a right to enjoy the fruits and advantages of his own enterprise, industry, skill, and credit. He has no right to be protected against competition, but he has a right to be free from malicious and wanton interference, disturbance, or annoyance. If disturbance or loss come as a result of competition, or the exercise of like rights by others, it is *damnum absque injuria*, unless some superior right, by contract or otherwise, is interfered with. But if it come from the merely wanton and malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing, and falls within the principle of the authorities first referred to." The plain-

tiffs can ask no more liberal rule of law to be applied to the determination of this case. The rule has been very seriously questioned, and the doctrine boldly asserted that any interference with one's trade is lawful, unless it be by violence, threats, or intimidation. It is unquestionably lawful for a man to advance the interests of his own trade by competition, although the result be ruin to his rival. With this rule of law conceded, it is plausibly argued that civil liability cannot depend upon the motive of an act, whether it be malicious or for a legitimate advantage in one's trade. Such a rule is very ably argued, and authorities cited in support thereof, in an essay found in 21 Amer. Law Rev. p. 509. But the doctrine of *Walker* v. *Cronin* seems to be recognized in the case of *Mogul Steam-Ship Co.* v. *McGregor*, 23 Q. B. Div. 598, 618. BOWEN, L. J., in writing for a majority of the court, says: "In cases like these, where the elements of intimidation, molestation, or the other kinds of illegality to which I have alluded are not present, the question can be decided by the application of the test I have indicated. Assume that what is done is intentional, and that it is calculated to do harm to others. Then comes the question, was it done with or without just cause or excuse? If it was *bona fide* done in the use of a man's own property, in the exercise of a man's own trade, such legal justification would, I think, exist not the less because what was done might seem to others to be selfish and unreasonable. But such legal justification would not exist when the act was merely done with an intention of causing temporal harm, without reference to one's own lawful gain or the lawful enjoyment of one's own rights. If the real object were to enjoy what was one's own, or to acquire for one's self some advantage in one's property or trade, and what was done was done honestly, peaceably, and without any of the illegal acts above referred to, it could not, in my opinion, properly be said that it was done without just cause or excuse." This rule of law seems to be further recognized in *Steam-Ship Co.* v. *McKenna*, 30 Fed. Rep. 48, where it was held that such acts as here proven, committed for the purpose of compelling the master to comply with certain demands as to workmen, were illegal and actionable. In the case at bar, however, the demand was for an increase in wages. There was no malice in the making of this demand. It was for an advantage in their business which they had the right to seek by all lawful means. In the *Mogul Steam-Ship Co. Case, supra*, BOWEN, J., at page 619, says: "One may with advantage borrow, for the benefit of traders, what was said by ERLE, J., in *Reg.* v. *Rowlands*, 17 Q. B. 671, of workmen and of masters,—'The intention of the law is at present to allow either of them to follow the dictates of their own will with respect to their own actions and their own property; and either, I believe, has a right to study to promote his own advantage, or to combine with others to promote their mutual advantage.'" In *People* v. *Kostka*, 4 N. Y. Crim. R. 434, upon an indictment for boycotting complainant's bakery, Justice BARRETT says: "As I said before, they may co-operate to improve their condition and increase their wages. They may refuse to work for less than the price they have jointly fixed, and they may do everything that is lawful and peaceable to secure that price. They may even go to their brethren and beseech them not to work for less than the fixed rate. They may use all fair arguments to prevent acceptance of less than the agreed standard of wages. All this they may lawfully do. Argument, reasoning, and entreaty are lawful weapons."

The tendency of modern thought and judicial decision is to the enlargement of the right of combination, whether of capital or of labor. All restriction has not been removed; but I am not willing to hold that the combination which appears in this case, in itself, and apart from the methods used, is within the condemnation of the law as it is now interpreted by our courts. Irrespective of any statute, I think the law now permits workmen, at least within a limited territory, to combine together, and by peaceable means to seek any legitimate advantage in their trade. The increase of wages is such

an advantage. The right to combine involves of necessity the right to persuade all co-laborers to join in the combination. This right to persuade co-laborers involves the right to persuade new employes to join in the combination. This is but a corollary of the right of combination. But this decision must not be misunderstood. I do not decide that all the acts of the strikers were legal. This action was tried to obtain an adjudication upon certain acts, as to the legality of which counsel differed. The defendants' counsel conceded that it was not lawful to procure plaintiffs' employes to leave plaintiffs by violence, threats, or intimidation. As the illegality of such acts was conceded, the plaintiffs' counsel, at the suggestion of the court, offered no proof whatever of the use by defendants of violence, threats, or intimidation. Counsel differed, however, as to the right of the strikers to induce plaintiffs' employes to leave by the use of persuasion and entreaty. Facts were admitted sufficient to raise this question, and this question alone has been here decided. There may be cases, however, where persuasion and entreaty are not lawful instruments to effect the purposes of a strike. Even persuasion and entreaty may be used in such a manner, with such persistency, and with such environments as to constitute intimidation. Their use then becomes a violation of law. In Wright on Criminal Conspiracies, at page 39, in speaking of the *Druitt Case,* (Bramwell, B., 1867, not reported,) it is said: "The learned judge added that, in his opinion, it was impossible to have an effectual system of picketing without being guilty of that alarm and intimidation and obstruction which is a breach of the law." In this case, however, it appeared that the strikers shouted and hooted at the employes, and assumed a hostile attitude towards them. In *People* v. *Kostka, supra,* Justice Barrett says: "The mere fact that no violence was used in the street is not conclusive. It is for you [the jury] to say whether the attitude of these men was threatening. Nor is it necessary that there should have been a direct threat. If you believe that the attitude actually presented by the distributors of those circulars was an attitude of intimidation, either to the passers-by or to the woman inside, considering all the circumstances, then all who participated in it, directly or indirectly, are within the meaning of that word 'intimidation,' as used in the conspiracy act." It stands conceded by defendant's counsel that the strikers have not the right to assemble in front of a factory in such numbers as to constitute intimidation. Picketing may be done in such numbers as to constitute intimidation. Jeering and shouting at employes by strikers may constitute intimidation. Persuasion or entreaty may be so persistent as to constitute intimidation. Wherever the strikers assume towards the employes an attitude of menace, then persuasion and entreaty, with words however smooth, may constitute intimidation, which will render those who use them liable to the penalties both of the civil and criminal law. There has been no evidence offered in this case as to circumstances surrounding the acts of persuasion and entreaty, so that the court can hold that they were so used as to constitute intimidation, and thus become unlawful. It may be impossible to lay down a general rule as to what surrounding circumstances will characterize persuasion and entreaty as intimidation. Each case must probably depend upon its own surroundings. But where the evidence presents such a case as to convince the court that the employes are being induced to leave the employer by operating upon their fears rather than upon their judgments or their sympathy, the court will be quick to lend its strong arm to his protection. Rights guarantied by law will be enforced by the courts, whether invoked by employer or employe.

The offer by defendants of money to pay expenses of the employe is lawful. The assistance given to those needing it is lawful, even if offered as an inducement to the employe to leave. It is only a just provision to those who have surrendered their wages, perhaps from sympathy for defendants. The posting of names of those who contribute to funds sought and lawfully used

for sustaining the strike, and of those who refuse to contribute, is lawful as long as the strikers keep within the law. If, however, their purpose be an unlawful one, and not for an advance of wages, or if they seek to accomplish a lawful end by unlawful means, then they are guilty of illegal conspiracy, and the posting of the names of contributors and non-contributors is a part of such conspiracy and unlawful.

There remains only to consider the acts of defendants who are connected with the publication of the Binghamton Leader. If an illegal conspiracy exist, whether it be to accomplish an unlawful end or a lawful end by unlawful means, not only are the actors wrong-doers, but all those who encourage and abet are equally guilty of the wrong. The publishers have the right to publish fair and impartial accounts of what occurs. But when their accounts of an unlawful conspiracy are so colored as to express approval and encouragement, then they have overstepped the lawful province of journalism, and come within the condemnation of the law. I have no difficulty in finding both in the local and editorial columns distinct encouragement and approval of the ends and methods of the strikers. If the strikers' acts in persuading and entreating plaintiffs' employes to leave had been unlawful, then those defendants connected with the publication of the Leader would be equally guilty. But I can find no illegality in their encouragement of acts of the strikers which I have held lawful. These considerations lead to a dismissal of plaintiffs' complaint.