and upon the question of the telephone authority it seems clear from a reading of the evidence that the plaintiffs have failed to establish the authority necessary to charge the defendant.

The judgment appealed from should be reversed, and a new trial granted, with costs to abide the event. All concur.

---

(50 Misc. Rep. 1.)

BUTTERICK PUB. CO., Limited, v. TYPOGRAPHICAL UNION NO. 6 et al.

(Supreme Court, Special Term, New York County. March, 1906.)

1. INJUNCTION—WHEN GRANTED PENDENTE LITE.

An injunction pendente lite, containing the same relief that would be ultimately granted if plaintiff succeeded in the action, will not be allowed where plaintiff's right is doubtful.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 309.]

2. SAME—STRIKING EMPLOYÉS—THREATS.

Striking employés and local labor unions will be restrained from resorting to threats, intimidation, or fraud in their relations with employés who take their places, though their right to picket and to strive by argument to win over such persons is well established.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, §§ 174, 175.]

3. SAME—PUBLISHING CIRCULARS.

Striking employés of a publishing company and the local unions of which they are members have the right to publish circulars setting forth the circumstances of the strike, and requesting that their friends shall withhold patronage from the company, and will be enjoined only from resorting to threats, intimidation, or fraud in their relations with the customers of the publishing company.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 174.]

4. SAME—UNLAWFUL COMBINATIONS.

A combination refusing to have business dealings with another until he removes conditions deemed inimical to the members of the combination, or some of them, held together by argument or persuasion, and seeking to accomplish its purpose without violence, is not an offense against the law.

5. SAME—LIBEL AGAINST PROPERTY.

Equity will not enjoin a libel against property where plaintiff by his inability to prove special damage has no remedy at law.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 171.]

Action by the Butterick Publishing Company, Limited, against the Typographical Union No. 6 and others. Motion to continue preliminary injunction. Injunction modified and continued.

Noble, Jackson & Hubbard, for plaintiff.

Benjamin Patterson, for defendants I. P. P. & A. U. of N. A., and its officers.

Osborne, Hess & Churchill, for defendant Adams C. & W. P. P. Ass'n No. 51.

Alfred and Charles Steckler, for defendant Franklin Ass'n No. 23.

St. John & Talley, for defendant Typographical Union No. 6.

BLANCHARD, J. This is a motion to continue during the pendency of this action a preliminary injunction granted in the order to

show cause upon which this motion is made. The complaint alleges a conspiracy on the part of the defendant labor unions and individuals to injure the plaintiff's business by causing a strike among its employés, by picketing its places of business and boycotting its customers, by distributing libelous circulars, letters, and posters regarding the plaintiff's relations with its employés, and by carrying into execution all of said acts with threats, intimidation, force, and fraud; in conclusion the complaint prays for a permanent injunction. The details of the preliminary injunction heretofore granted are more fully discussed hereinafter. In effect, it restrains substantially all the acts described in the complaint. Prior to about November 24, 1905, the plaintiff employed about 233 pressmen and feeders, and about 95 compositors, who were members of the respective defendant local unions. The defendant International Printing Pressmen & Assistants' Union was then the parent organization of two of the defendant local unions, the Adams Cylinder & Web Press Printers' Association No. 51 and Ben. Franklin Association (feeders) No. 23. Whether the plaintiff had made an agreement with its employés or their unions regarding the terms of employment is much disputed. Beginning January 1, 1905, it appears that the plaintiff paid its compositors the same rate of wages as was fixed in the contract between the defendant New York Typographical Union No. 6, to which the compositors belonged, and the Typothetæ, an employers' association, to which the plaintiff did not belong. No contract, however, was legally completed by this circumstance. Upon all the facts it appears that the plaintiff merely hired its employés by the week, and that no contract regarding the continuance of the rate of wages or conditions of labor existed between the plaintiff and its employés or any of the defendant unions. On November 24, 1905, the compositors, members of No. 6, who were then working on a nine-hour day, ceased work because of the refusal of the plaintiff then to agree to an eight-hour day after January 1, 1906, and because the plaintiff had then employed four nonunion men who were willing to continue on a nine-hour day. Prior to this date a dispute had existed between the pressmen and the feeders and their respective unions regarding who should handle the brakes on presses. The International Association decided that the feeders, composing No. 23, instead of the pressmen, composing No. 51, should handle the brakes. Upon the announcement by the plaintiff that after December 5, 1905, it would, in accordance with this decision, turn over the brakes to No. 23, the pressmen, composing No. 51, ceased work. Because of this insubordination the International Association revoked the charter of No. 51, and took steps toward forming a substitute union, from which the plaintiff might eventually be supplied with pressmen. The plaintiff, meanwhile, sought to tide over the strike of No. 51 by putting the feeders of No. 23 upon work customarily done by the pressmen of No. 51. In this action the plaintiff was apparently encouraged by the acquiescence of several members of No. 23, who appeared willing to do pressmen's work. It does not clearly appear that No. 23 was permitted by its rules thus to take the place of the striking pressmen of No. 51, nor that the feeders composing No. 23 were qualified to do pressmen's work. For these reasons, or for other and unknown reasons, the feeders composing No. 23 ceased work on December 3, 1905. The

International Association denies that it ordered the strike of No. 23, and declares that it is ignorant of the cause of the strike, and assigns the causes above mentioned as possible explanations, and states that it is now investigating the matter with a view to official action. Through the solicitation of representatives of No. 6, the Hearst syndicate of newspapers has discontinued the pattern service of La Belle Fashion Company, a customer of the plaintiffs, to the damage of the plaintiff, who did the fashion company's printing work. The syndicate had agreed with the fashion company to transmit for the latter such orders for pattern service as the members of the syndicate might choose to give, and the fashion company agreed to supply such copy to the syndicate at certain rates. Since no member of the syndicate was under obligation to order pattern service, the solicitation by representatives of No. 6 was not an interference with the performance of the contract, but merely dissuasion of custom. Circulars, letters, and placards, the contents and mode of address of which showed that they emanated from the defendant local unions, were distributed throughout the United States and Canada for the purpose of dissuading customers from purchasing publications published by the plaintiffs, or printed by the plaintiff for other publishers. Samples of the language of the circulars most complained of are as follows:

"Standard Dress Patterns, Martha Dean, La Belle, Little Folks, and Banner should equally be avoided." "No copy of The Designer, The New Idea Magazine, The Standard, or the New Idea Patterns, or other Butterick publications, should be in the home of any union man or in the home of any of his friends." "Since the Butterick Company managers prefer the services of scabs, let them look to scabs to buy their publications and patterns." "Merchants who sell these patterns and dealers who handle these publications should be given fair warning that they cannot expect to retain your patronage while continuing to act as agents for the Butterick Company." "We give fair warning that we shall advise and request all wage earners and their friends, organized and unorganized, to withdraw their patronage from merchants and agents for The Delineator, The Designer, The New Idea Magazine, The Butterick Patterns, The Standard Patterns, The New Idea Patterns, The Banner Patterns." "Wherever in this wide world there lives a union man, we shall endeavor to acquaint him with the contemptible act of the Butterick Company. You are hereby notified that the Butterick Publishing Company has locked out all its union employés." "The tricks of stock jobbing are many, and the Butterick Publishing Company is capitalized at several millions." "Pressmen, stereotypers, photo-engravers, and electrotypers received the same outrageous treatment [that is, were] discharged, and on the following morning filled their places with imported scabs and nonunion men."

In consequence of these circulars, plaintiff has received from its agents and customers about 135 letters, either discontinuing subscriptions or begging the plaintiff to adjust its difficulties, and assigning as the reason for writing their sympathy with trade unions, or their fear of loss of trade through continuing their subscriptions. Until the preliminary injunction was granted herein, the defendant local unions maintained pickets aggregating 25 or 30 men about the premises of the plaintiff's building. When new employés were brought to the building in cabs, these pickets were frequently joined by other members of the defendant local unions, from their headquarters opposite the plaintiff's building, and the crowds thus formed swarmed about the cabs in excited fashion, and jostled and accosted in threatening manner the newcomers.

The plaintiff was obliged to maintain a special officer to keep back this crowd, and frequently to call upon the patrolmen in the vicinity to make a way into the building. An automobile which was used to take some of the new employés out for fresh air was followed some distance from the building by a hooting mob, in which certain members of the defendant local unions were conspicuous, and was stoned by a similar mob upon its return. Several acts of assault and battery were committed by unidentified persons in the immediate neighborhood of the plaintiff's building upon new employés leaving the premises at night; at least one was committed by a member of one of the defendant local unions, and in the crowd that joined in another assault a number of members of No. 6 and No. 51 were conspicuous. These acts of violence were reported to the police, and the police captain of the precinct found it necessary to assign special details to prevent assaults when the employés were let out of the building, and to furnish officers to escort the employés to their homes, and to direct the men to disperse the crowds, which sometimes became so large about the building that traffic was interrupted. Derisive and threatening language was hurled by these crowds at the employés of the plaintiff when they appeared upon the streets. By reason of these acts the plaintiff has found it necessary, since the 1st of December, 1905, to board and lodge in its building a considerable number of its employés, at an expense to it of $2,500 a week. Since the preliminary injunction was obtained herein no acts of violence or molestation have been reported, the streets have been free from crowds, and the employés have freely gone to and fro from plaintiff's mill to their homes. The preliminary injunction hereinbefore granted restrains the defendants from making any requests, giving any advice, or resorting to any species of pursuasion, threats, intimidation, force, or fraud which operates to overcome the exercise of the free will of any employé or customer of the plaintiff. Specifically, the defendants are further restrained from accomplishing these purposes by picketing the plaintiff's place of business, by circulating defamatory publications, or making oral communications to employés, customers, merchants, and newsdealers handling the plaintiff's patterns and publications, or any persons who are about to become or might otherwise become such parties.

When the plaintiff's right to the equitable relief sought is involved in doubt, the court will not grant an injunction pendente lite containing the same relief that would ultimately be granted if the plaintiff succeeded upon the trial of the action. Cohen .v. United Garment Workers, 35 Misc. Rep. 748, 72 N. Y. Supp. 341, and cases cited; Kerbs v. Rosenstein, 56 App. Div. 619, 621, 67 N. Y. Supp. 385.

Upon the affidavits it does not appear that the International Union is chargeable with any of the acts complained of in the moving papers. As to this defendant and the individual defendants named as its officers the preliminary injunction is therefore vacated. Through the excessive activity of the pickets maintained by the defendant local unions and the zeal of the members of these unions to obtain their demands by discouraging persons from entering the plaintiff's employ acts of violence have occurred. These acts occurred, in some instances, through the actual agency or connivance of the members of the defendant local

unions, and in many other instances they were an almost inevitable consequence of the overzeal of pickets and members of the defendant local unions. Members of the defendant local unions have thronged the streets or caused the streets to be thronged with such crowds as to interrupt traffic and to intimidate the employés of the plaintiff. They have approached the plaintiff's employés in such numbers and in such threatening manner as to put them in fear of bodily harm. They have waited for plaintiff's employés, and followed them and derided them with a persistence that exceeds the proper limits of persuasion, and becomes an unwarranted annoyance and harassment. The right of the defendants to maintain pickets is well established, provided, however, that such picketing is not accomplished by acts expressing or implying threats, intimidation, coercion, or force. Sun Printing & Pub. Ass'n. v. Delaney, 48 App. Div. 623, 62 N. Y. Supp. 750 (compare record); Mills v. U. S. Printing Co., 99 App. Div. 605, 91 N. Y. Supp 185; Kerbs v. Rosenstein, supra; Levy v. Rosenstein (Sup.) 66 N. Y. Supp. 101, affirmed in 56 App. Div. 618, 67 N. Y. Supp. 630; Foster v. Retail Clerks' Protective Assn., 39 Misc. Rep. 48, 78 N. Y. Supp. 860; Rogers v. Evarts (Sup.) 17 N. Y. Supp. 264. As was said in Rogers v. Evarts, supra:

"The right to combine involves, of necessity, the right to persuade all co-laborers to join in the combination. The right to persuade co-laborers involves the right to persuade new employés to join the combination."

The strikers may freely strive to win over others to their support by reason, arguments, and proper appeal. Kerbs v. Rosenstein, supra. "Arguments, reasoning, and entreaty are proper weapons." People v. Kostka, 4 N. Y. Cr. R. 429, 435; People v. Wilzig, 4 N. Y. Cr. R. 403, 418. But picketing, argument, reasoning, and entreaty must not be so practiced or carried to such extremes as to become, in effect, intimidation, threats, coercion, or force. The jeering of pickets, it is said, may, under some circumstances, constitute intimidation. "Even persuasion and entreaty may be used in such a manner, with such persistency, and with such environments as to constitute intimidation. Their use then becomes a violation of law." Rogers v. Evarts, supra. Compare People v. Kostka, supra; People v. Wilzig, supra.

Upon the affidavits before the court it appears that the proper bounds of reasoning and entreaty in dealing with the plaintiff's employés have been so exceeded by the defendant local unions and their members, and that the repetition of threats, intimidation, coercion, and force, with the resulting damage to the plaintiff's business, is so likely that a continuance of the injunction in some respects must be granted. As regards their relations to the plaintiff's employés, it is clear from what has already been stated that the defendant local unions and their members must be restrained from resorting to any threats, intimidation, force, or fraud, whether through the means of picketing or otherwise. The defendants are free, with these exceptions, however, and within the limits already indicated, to make any requests, or give any advice, or resort to any persuasion, for the purpose of winning support, and in so far as the preliminary injunction is inconsistent herewith it is vacated. The defendant local unions, through their representatives, have sought to

dissuade customers who are not under contractual obligations, and persons who might otherwise become customers, from purchasing publications and patterns published or printed by the plaintiff. Circulars, letters, placards, and posters have emanated from the defendant local unions, containing several innuendoes of possible libelous character, and asking that members of unions and their friends refrain from purchasing such publications and patterns, and from dealing with merchants who continue so to purchase. Upon the analogy of the principles already applied to the relation of the defendants to the plaintiff's employés, it appears that the defendants should not press any argument, reasoning, or entreaty to such an extreme that it becomes, in effect, a threat, intimidation, coercion, or force. The plaintiff contends that the dissuasion practiced by the defendants, as shown in the moving affidavits, constitutes threats and intimidation. The authorities, however, do not warrant this conclusion. In Park & Sons Co. v. National Druggists' Ass'n, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578, the plaintiff, a manufacturer of proprietary medicines, sought to enjoin the defendant association from inducing other manufacturers of proprietary medicines to enter into an agreement by which the latter agreed to sell their goods at a uniform jobbing price to such dealers only who, in selling said goods, conformed to the manufacturer's price list, and further agreed to sell to all other dealers only at the retail price. The plaintiff, who had refused to enter into this agreement, alleged in his complaint that the manufacturers of proprietary medicines were prevented from selling their goods to the plaintiff because they wished to protect themselves "with the wholesale and jobbing druggists." As to this allegation the court said (at page 11 of 175 N. Y., page 139 of 67 N. E. [62 L. R. A. 632, 96 Am. St. Rep. 578]) :

"The first allegation alluded to does not, as I understand it, amount to a threat when taken in connection with the other allegations of the complaint with reference to the plan devised for the conduct of the business. The proprietors might well deem it to be for their best interests to act in accord with the wishes of the druggist rather than those of the plaintiff."

Parker, C. J., in a concurring opinion, said (at page 20 of 175 N. Y., page 142 of 67 N. E. [62 L. R. A. 632, 96 Am. St. Rep. 578]) :

"The position attempted to be taken at this juncture by the plaintiff is that, granting the plans which the members of the association adopted were legal, nevertheless the wholesale dealers can be proceeded against in this suit because they compelled some or all of the manufacturers, against their will and inclination, to refuse to sell their goods to plaintiff by threats, intimidation, blacklisting, and other unlawful acts of the association. This language has a formidable sound, but, subjected to the same analysis as was given to the word 'threats' in the connection in which it was used in the National Protective Association Case, supra, it will prove to be without force. There are no threats alleged in this complaint on the part of defendants to do anything except that which they have a right to do, if the views so far expressed be sound, and we said in that case, and it is proper to repeat here, that a man may threaten to do that which the law says he may do, provided that, within the rules laid down in certain cases therein cited, his motive is to help himself. If there be any other 'intimidation' of manufacturers than that to be found in the agreements and written plans of this association, and the steadfast purpose on the part of its members to carry them out according to their letter, it is not to be found in the complaint."

In Mills v. U. S. Printing Co., supra, the court said (at page 611 of 99 App. Div., page 189 of 91 N. Y. Supp.) :

"I think that the statement of Bouvier (1 Bouvier L. Dict., Rawle's Rev., 260) is correct: 'A boycott is not unlawful unless attended with some act in itself illegal. [Bohn Mfg. Co. v. Hollis] 54 Minn. 223 [55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319]).' I think that the verb 'to boycott' does not necessarily signify that the doers employ violence, intimidation, or other unlawful coercive means, but that it may be correctly used in the sense of the act of a combination in refusing to have business dealings with another until he removes or ameliorates conditions which are deemed inimical to the welfare of the members of the combination, or some of them, or grants concessions which are. deemed to make for that purpose. And as such a combination may be formed and held together by argument, persuasion, entreaty, or by the 'touch of nature,' and may accomplish its purpose without violence or other unlawful means, i. e., simply by abstension, I think it cannot be said that 'to boycott' is to offend the law."

Under the decisions above quoted, it appears that the dissuasion which the defendant local unions, through their representatives, have thus far directed against the plaintiff's customers cannot properly be described as threats, intimidation, coercion, or force. In Park & Sons Co. v. Nat. Druggists' Ass'n, supra, the court said (at page 8 of 175 N. Y., page 138 of 67 N. E. [62 L. R. A. 632, 96 Am. St. Rep. 578]) :

"The members of the association clearly had the right to work for their own interests. They had the right to devise and adopt a plan for the conduct of the business in which they could make a commission or a profit. so long as they did not unlawfully interfere with the rights of others. They had the right to petition the manufacturers to adopt the plan devised by them, and to support their petition with all of the arguments and persuasions that they could bring to bear, so long as they did not resort to threats or intimidations."

Since the dissuasion thus far practiced by the defendants falls safely within this rule, it appears to be not unlawful. Regarding the rule just applied, it is proper to remark that a modification has sometimes been intimated. An act which might otherwise be lawful, it is argued, will be tortious if committed with malice; and accordingly, if the acts of dissuasion committed by the defendants were committed with malevolent motives toward the plaintiff, rather than with benevolent motives to the defendants' own interest, they lose their lawful character and become illegal. A faint recognition of this principle is said to be found in Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496; Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5; Park & Sons Co. v. National Druggists' Ass'n, supra; Mills v. U. S. Print. Co., supra. Contrary expressions, however, are found in National Protective Assn. v. Cumming, 170 N. Y. 315, 326, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648, and Foster v. Retail Clerks' Protective Ass'n, supra. Upon the authorities it must be stated that this modification has not become settled in the law of this state. Foster v. Retail Clerks' Protective Assn., supra. Even if this modification of the rule were settled, however, it seems that the acts of the defendants, within the intention of the modified rule, would be regarded as benevolent to themselves, rather than malevolent to the plaintiff. Compare National Protective Ass'n v. Cumming, supra; Jacobs v. Cohen, supra; Mills v. U. S. Print. Co., supra.

As to the defendants' relation with the plaintiff's customers or persons who might otherwise become customers, the defendants, excepting only the International Union, must be restrained from resorting to any means of dissuasion in effect amounting to threats, intimidation, force, or fraud; and in so far as the preliminary injunction proceeds further than this it must be vacated.

Regarding the circulars, letters, placards, and posters that have emanated from the defendants, the direction above made regarding dissuasion in general is fully applicable. The court is asked to restrain the further publication of the written and printed matter above mentioned, on the additional ground that it contains innuendoes of a libelous character. Without in any particular restricting the direction above made restraining dissuasion amounting to fraud, whether in the form of written or printed publications or otherwise, the court must refuse to restrain the publication of written or printed matter which merely is libelous. A court of equity will not enjoin a libel against property where the plaintiff by reason of his inability to prove special damage has no remedy at law. Marlin Fire Arms Co. v. Shields, 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310; De Wick v. Dobson, 18 App. Div. 399, 46 N. Y. Supp. 390. The defendants were within their legal rights in publishing circulars setting forth the circumstances of the strike, and requesting their friends to withhold their patronage from the plaintiff. Sinsheimer v. United Garment Workers, 77 Hun, 215, 28 N. Y. Supp. 321; Cohen v. United Garment Workers, supra; Foster v. Retail Clerks' Protective Ass'n, supra. Upon the affidavits, it does not appear how great was the loss of business, if any, that resulted from the alleged libelous statements. From the letters written by customers who withdrew their patronage, it would seem that they were actuated by those parts of the circulars which were undeniably lawful.

The preliminary injunction, in so far as it restrains the defendant local unions and individuals from resorting to any species of threats, intimidation, force, or fraud in their relations with the plaintiff's employés or customers must therefore be continued. The preliminary order of injunction will be modified in the respects indicated, and, as so modified, continued. Settle order on notice.

Injunction modified, and, as so modified, continued.