Syllabus.

# Richmond.

Everett Waddey Company and Others v. Richmond Typographical Union No. 90 and Others.

March 15, 1906.

Absent, Keith, P.

1. Strikes—*Injunction—Equity Jurisdiction.*—Equity has jurisdiction on the ground of the inadequacy of the remedy at law, to enjoin strikers from illegally interfering with and molesting employers in the conduct of their business.

2. Labor Unions—*Right to Organize—Strikes—Freedom of Action—Arguments—Resort to Force—Injunction.*—Laborers, as well as capitalists, may organize for their own protection and to further the interests of the laboring class. Freedom is the rule. It is not a criminal conspiracy for them to combine for the purpose of enhancing the rate of wages, or for improving their relations with their employers. They may refuse to work for any man or any class of men, or except upon given conditions. They may, by arguments and personal appeals, persuade and induce others in the same occupation to join their union, and, to that end, may extend to them strike benefits and transportation to other localities, and refuse to allow members to work in places where non-union men are employed, but they have no right to use force and violence, nor to terrify and intimidate new employees. When they resort to unlawful means to cause injury to others with whom they have no relations, contractual or otherwise, the limit permitted by the law is past and they may be restrained. Where the evidence presents such a case as to convince the court that employees are being induced to leave the employer by operating upon their fears rather than upon their judgments, or their sympathy, the courts will lend their aid to prevent it.

3. Strikes—*Picketing—Obstructing Streets—Intimidation.*—"Picketing" by strikers is not unlawful so long as the number of pickets is not

so great as to overawe or intimidate the non-union workmen, nor in any manner to obstruct the streets and sidewalks, provided the· pickets confine themselves to the use of persuasion and argument with the non-union employees, and is not carried to an extent which: causes intimidation or which amounts to coercion, compulsion or molestation in any form of either the non-union workmen or their· employers.

4. STRIKES—*Unlawful Conspiracy—Means Employed—Case in Judgment.* A combination lawful in itself may become a conspiracy when the· purpose in view is to ruin or damage the business of another because of his refusal to do some act against his will or judgment, and all parties to such a conspiracy are liable for all overt acts. illegally done in pursuance thereof whether they are active participants or not. No persons, individually or in combination, have· the right, directly or indirectly, to interfere with or disturb another in his lawful business or occupation, or to threaten to do so for the· sake of compelling him to do some act which in his judgment his own interest does not require. In the case in judgment, the means· employed by the strikers to induce new employees to quit their· employment and others to refuse to take employment were not unlawful. The charge of bribery is not sustained; the conduct of the· pickets was neither violent nor threatening, but was quiet and orderly; and the only violence shown was not attributable to the· strikers as such, nor the result of employment of a non-union man..

5. BRIBERY—*Inducing Employees to Quit Work—Injunction—Equity Jurisdiction.*—Bribery is not only unlawful, but criminal, and when. resorted to with a malicious purpose to injure a third person in his business, property or personal liberty is ground for equitable interposition by injunction, if practiced in such a manner and to such. an extent that the party injured, or intended to be injured, has not an adequate remedy at law for his injuries. In the case in judg-- ment the charge of bribery is not sustained.

6. EQUITY PRACTICE—*Preliminary Injunction—Dissolution—Continuing· Case Till Hearing.*—While a preliminary injunction to prevent strikers from molesting complainants in the conduct of their business may· have been rightly dissolved on the case as it stood when the motion was made, it is entirely .proper for the court to continue the case on the docket with right to complainants to move for further injunctions *pendente lite*, and reserving to them the right to such relief as they may show themselves entitled to upon the final hearing..

Appeal from a decree in chancery of the Chancery Court of the city of Richmond. Decree in favor of the defendants. Complainants appeal.

*Affirmed.*

The opinion states the case.

*Wyndham R. Meredith,* for the appellants.

*John A. Lamb* and *L. O. Wendenburg,* for the appellees

CARDWELL, J., delivered the opinion of the court.

This appeal arises out of a litigation between the appellants, complainants below, members of the unincorporated association known as the Richmond Typothetæ, which is a branch of the United Typothetæ of America, the membership of which are engaged in the business of printing, etc., and the appellees, members of the Richmond Typographical Union No. 90, a branch of the International Typographical Union, also an unincorporated association, composed of a large majority of the employees of the employing printers, etc., of the United States.

The main object of the first-named association is to protect and advance the interests of its members by uniting their strength to prevent a reduction in the number of hours requisite to constitute a day's work, or an increase, against their own will, of the wages received by their employees, and especially to prevent the inauguration of what is commonly known as the "Eight Hour Day"; while that of the second-named association, so far as its objects and aims bear upon this controversy, is to compel the employers of journeymen compositors, or practical printers, to employ none but members of the International Typographical Union, and to agree that eight hours a day, instead of

nine, with the same scale of wages, shall constitute a day's work.

The International Typographical Union has been for eight years or more insisting that the hours of labor should be reduced from nine to eight hours a day, while the United Typothetæ has insisted that nine hours should continue to constitute a day's work.

In September, 1905, the Typothetæ finally refused to grant the eight-hour day, and thereupon the Typographical Union instructed the local unions in the different cities of the United States (among them the city of Richmond) to declare a "strike" where the eight-hour day was refused; and the appellants, members of the Richmond Typothetæ, the owners and operators of printing establishments in the city of Richmond, still refusing to grant the eight-hour day, Typographical Union No. 90 and employees of appellants, on September 11, 1905, went out on a "strike." After the strike took place the appellants, whose business was thrown into great confusion thereby, undertook to supply the places of their former employees who had joined the "strike" with other and non-union printers, and on October 21, 1905, their bill was filed in this cause against appellees, charging them with certain acts of interference with the business of appellants and their present employees, to the great injury of appellants; that through the officers and members of appellees' union they have in every way sought to annoy, hound, interfere with, entice away, purchase and bribe appellants' present employees, so as to get these employees to leave appellants' employment; that at the time appellees made these efforts they well knew that said employees were in the service of appellants; that appellees, with intent to cripple and destroy the business of appellants, have illegally conspired and combined to prevent appellants from filling the places of the strik-

ers with other employees; that appellees have laid in wait for appellants' present employees for the purpose of enticing them to leave the service of appellants; that appellees have picketed the business places of appellants and followed their new employees to their homes and boarding-houses and there accosted them in the effort to entice them away from appellants' employ; that appellees have offered bribes, free transportation and strike benefits to these employees to induce them to leave appellants' employment, and have threatened said employees that unless they did leave their employment they would incur the ill-will of all organized labor and friends of labor. It is further charged that one certain employee (Wilde) has to be protected against the strikers by an armed escort, and even then cannot escape their threats and abuse; that the keepers of the boarding-houses where some of the employees lodge have made complaint that members of the appellees' union come to their houses at all hours, and create a nuisance thereby, and that several of the employees of appellants, as the result of these efforts on the part of appellees, have been enticed away, etc.

A preliminary injunction was awarded in accordance with the prayer of the bill restraining appellees from in any manner interfering with the business of appellants, or any of them, or their agents or employees, in the operation of the business conducted by appellants, "until the said court should make other orders to the contrary"; and on November 23, 1905, pursuant to notice, a motion was made before the learned judge below to dissolve the said injunction as improvidently awarded, which motion was heard upon the verified bill of complaint and a number of affidavits taken and read in support thereof; the verified answer of appellees to said bill and a number of affidavits read in support thereof; whereupon the decree from which this case comes before us for review was made, wholly

dissolving the injunction, but "without prejudice to such decree as it may appear that the plaintiffs are entitled to upon a final hearing of this cause," the judge presiding being of opinion that the evidence before him was not sufficient to show that appellees had "in any way molested or annoyed the complainants so as to entitle the latter to the injunction of October 21, 1905."

It seems to be conceded, in accordance with a long line of decisions, that if the allegations of the bill in this case are sustained by the proof, it is a case for equity jurisdiction, and the remedy is by injunction, since appellant's remedy at law would be inadequate. *Beck* v. *Ry. Teamsters' Protective Union* (Mich.), 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421, and authorities cited; *Miller* v. *Wills, etc.,* 95 Va. 327, 28 S. E. 337.

The language of the demand made by appellees upon appellants in their written notice of September 11, 1905, is as follows: "In accordance with the well-known policy of the I. T. U. to put into operation an eight-hour day in all printing offices employing union men on January 1, 1906, Richmond Typographical Union No. 90 announces to you their intention to work on and after that date only eight hours per day.

"They respectfully ask that you indicate in writing by 4 o'clock this afternoon whether you will agree to continue to employ union members in your office after the date named, under the conditions stated. . . . ."

The purport of that demand was that unless appellants accepted the conditions and terms stated therein, members of the I. T. U. would discontinue their employment with appellants. This was unquestionably the privilege of appellees, as of every employee, except as he may be bound by a contract, to abandon the service of his employer, but to what extent the employee

may go beyond quitting his employment to compel the employer to accept terms of his employment, which the employer is unwilling to concede, is the question to be determined in all controversies of the character of the one now before us.

We could not in an opinion within reasonable length undertake to review all the numerous authorities to which we have been cited as bearing upon the questions presented.

It is now well settled by the decisions of the courts of the United States and of the highest courts of a majority of the States in the Union that labor may organize as capital does for its own protection and to further the interests of the laboring class. They may "strike" and persuade and induce others to join them, but when they resort to unlawful means to cause injury to others to whom they have no relation, contractual or otherwise, the limit permitted by law is passed and they may be restrained. *Gray* v. *Trades Council* (Minn.), 97 N. W. 663, 63 L. R. A. 753, 103 Am. St. Rep. 477, and cases there cited; *Murdock* v. *Walker,* 152 Pa. 195, 25 Atl. 492, 34 Am. St. Rep. 678; *Otis Steel Co.* v. *Local Union No.* 218, 110 Fed. Rep. 700; *Consol. S. & W. Co.* **v.** *Murray,* 80 Fed. Rep. 810; *Union Pac. R. Co.* v. *Reuff,* 120 Fed. Rep. 102; *Alis-Chambers Co.* v. *Loge,* 111 Fed. Rep. 264; *Beck* v. *Ry. Union, supra; Plant* v. *Woods,* 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 339, 79 Am. St. Rep. 330; Eddy on Comb. Vol. 2, §§ 1031, 1035; Beech on Mono. and Indus. Trusts, §§ 98, 100, 102; Tiedman on St. and Fed. Control of Persons and Property, Vol. 1, § 114.

In many of the States of the Union there are statutes which provide for the incorporation of trades unions and other labor organizations, and in all of them one of the permissible objects of incorporation is declared to be the securement of better terms of employment; while at common law, as interpreted by the English decisions and a few of the earliest decisions of the

courts in this country, labor combinations formed for the purpose of controlling the rate of wages were regarded as a criminal conspiracy. But these early decisions of the courts of this country were soon departed from by other cases, notably in Massachusetts, New York and Pennsylvania, which placed labor combinations upon a plane of legal equality with capitalistic combinations, by holding that it was not a criminal conspiracy for workmen to combine for the purpose of enhancing the rate of wages, or for improving, in any other way, their relations with employers.

In *Carew* v. *Rutherford,* 106 Mass. 1, 8 Am. Rep. 287, the court said: "Every man has a right to determine what branch of business he will pursue, and to make his own contracts with whom he pleases and on the best terms he can. He may change from one occupation to another and pursue as many different occupations as he pleases, and competition in business is lawful. He may refuse to deal with any man or class of men; and it is no crime for any number of persons, without an unlawful object in view, to associate themselves together and agree that they will not work or deal with certain men or classes of men, or work under a certain price or without certain conditions. . . . Freedom is the policy of this country."

It is lawful for workmen to combine to control the terms of their own hiring, and such a combination is easily distinguishable from one in which the purpose is to control the business of the employer in other matters, not affecting the terms of their own hiring, as, for example, the prevention of the employment of non-union men. *Master Stevedores* v. *Walsh.,* 2 Daly (N. Y.) 1.

In *Gray* v. *B. T. Council, supra,* the opinion says: "The authorities, as already noted, very generally hold that a strike is not unlawful; that members of the labor unions may singly,

or in a body, quit the service of their employer, and, for the purpose of strengthening their association, may persuade and induce others in the same occupation to join their union, and as a means to that end refuse to allow their members to work in places where non-union labor is employed."

In 18 Am. & Eng. Ency. L. (2d ed.) 87, it is stated to be the law, citing a number of decided cases, that: "It is not unlawful for strikers, by persuasion, to cause employees to leave the service of their employer, or to dissuade other workmen from seeking employment with him."

But on the other hand it is fully as well settled that while "strikers" have the right to argue or discuss with new employees who have taken their places the question whether they should work for the employer and the right to persuade new employees not to do so, if they can, in presenting the matter they have no right to use force or violence, nor to terrorize or intimidate the new employees. *Union Pac. R. Co.* v. *Reuff*, and other authorities, *supra.*

In Eddy on Combinations, section 1031, *supra,* the author says "Where there is no sufficient evidence of violence, force, intimidation, or coercion, and the facts simply show that the parties complained of are persuading workmen still employed to quit their employment, and others, about to accept employment, not to do so, and that the persuasion consisted of arguments, personal appeals, and inducements by way of payment of traveling expenses to other localities, an injunction will not be granted."

To the same effect is *U. S.* v. *Kane,* 23 Fed. Rep. 748; *Murx & Haas Co.* v. *Watson,* 168 Mo. 133, 67 S. W. 391; *Otis Steel Co.* v. *Local Union, supra; H. B. Shoe Co.* v. *Saxey,* 131 Mo. 212, 32 S. W. 1106, 52 Am. St. Rep. 622; *Vegelahn* v. *Gunter,* 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443.

In the last cited case a preliminary injunction was granted, prohibiting the union from "interfering with plaintiff's business by patroling the sidewalk or street in front, or in the vicinity of, the premises occupied by him, for the purpose of preventing any person or persons, who now are, or hereafter may be, in his employment, or desirious of entering the same, from entering it, or continuing in it"; and upon a hearing of the cause upon the bill and answer before a single judge of the Supreme Court of Massachusetts, according to the practice of that court, the judge (Holmes) ruled that the employment of "persuasion and social pressure" to induce employees to leave the service of their employer was not unlawful; but upon a hearing of the cause by a full court a majority of the judges were of opinion that the injunction should be in the form it was originally issued. The facts of that case, however, were very different from the facts of the case we have in hand.

"Picketing" is one of the methods usually adopted by "strikers" in furthering their purposes, and here, as in the matter of argument and persuasion, they have a right to pursue that method, so long as its use does not become unlawful.

In 1 Eddy on Combinations, page 437, the author says: "It is unlawful for workmen to collect in crowds about the establishment of an employer whose employ they have quit; and it is unlawful for them to follow workmen, who have taken their places, to their homes and interfere with them along the public streets for the purpose of intimidating or coercing them in quitting their employment." And again, at page 439, says: "Pickets may be established about factories and places where non-union men are employed, providing the number of pickets is not so great as to overawe or intimidate the non-union workmen, or in any manner obstruct the street or sidewalk, and providing the so-called *pickets* confine themselves to the use of per-

suasion or argument with the non-union employees; but, if the watching or picketing is carried to an extent which causes intimidation or amounts to coercion, compulsion or molestation in any form of either the non-union workmen or their employers, it is unlawful, and the combination making use of such unlawful means is a conspiracy." See also Beech on Mono. & Indus. Trs., *supra*, page 327.

The decided cases uniformly take the same view as to the law stated by the learned authors to which we have just referred.

A combination, lawful within itself, may become a conspiracy when the purpose in view is to ruin or damage the business of another, because of his refusal to do some act against his will or judgment; and accordingly it was held in the well-considered case of *Doremus* v. *Hennessy,* 176 Ill. 608, 52 N. E. 924, 43 L. R. A. 797, 68 Am. St. Rep. 203, that all parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all overt acts illegally done in pursuance of such conspiracy and for the consequent loss, whether they were active participants or not.

In that case, as in the cases we have cited above, it was held that while the members of the labor union have the right to induce others by persuasion and argument to become members of their union, they have no right to insist that another person unite with them or fix his scale of prices as that of the union, and make his refusal a pretext to break up his business by inducing his customers to break their contracts and stop dealing with him. In the opinion it is said: "No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation, or to threaten to do so for the sake of compelling him to do some act which, in his judgment, his own interest does not require. . . .

"Every man has a right under the law, as between himself and others, to full freedom in disposing of his own labor or capital, according to his own will, and anyone who invades that right without lawful cause or justification commits a legal wrong, and if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong. . . .

"Competition in trade, business or occupation, though resulting in loss, will not be restricted or discouraged, whether concerning property or personal service. Lawful competition that may injure the business of another, even though successfully directed to driving that other out of business, is not actionable. Nor would competition of one set of men against another set, carried on for the purpose of gain, even to the extent of intending to drive from business that other set and actually accomplishing that result, be actionable unless there was actual malice. Malice as here used does not merely mean an intent to harm, but means an intent to do a wrongful harm and injury. An intent to do a wrongful harm and injury is unlawful, and if a wrongful act is done to the detriment of the right of another it is malicious; and an act maliciously done with the intent and purpose of injuring another is not lawful competition." See also *Miller* v. *Black Rock, &c., Co.,* 99 Va. 147, 40 S. E. 27, where it is held that the owner of percolating water can appropriate the same to his own use when the appropriation is not done from a malicious motive.

In the case at bar, while appellees in their answer practically deny all of the material allegations of the bill, they admit that by argument and persuasion only they have attempted to get certain of appellants' employees to become members of their union, but insist that they have not resorted to unlawful methods or to violence or intimidation of such employees. Now when

they attempted to get certain of appellants' employees to become members of their union, they well understood that when such employees became members of that union they necessarily would discontinue their employment with appellants, and they also well understood that the law forbade them to carry persuasion and entreaty to the extent of intimidating appellants' employees into becoming members of appellees' union; so that the question here to be determined is whether the means used by appellees since quitting their employment with the appellants to induce the new employees who have taken their places to quit their employment also, and others to refuse to take employment with appellants, were unlawful. If the allegations of appellants' bill are sustained by the proof, appellees have unquestionably molested and annoyed appellants in the conduct of their business, so as to entitle the latter to the injunction restraining them from further use of the means employed.

Says Beech, in his work on Monopolies and Industrial Trusts, at page 327, "It may be impossible to lay down a general rule as to what surrounding circumstances will characterize persuasion and entreaty as intimidation. Each case must probably depend upon its own surroundings. But where the evidence presents such a case as to convince the court that the employees are being induced to leave the employer by operating upon their fears rather than upon their judgments, or their sympathy, the court will be quick to lend its strong arm to his protection. Rights guaranteed by law will be enforced by the courts, whether invoked by employer or employee."

The gravamen of the complaint made by appellants is that by bribery, intimidation and coercion of their employees by appellees they are being molested, annoyed and irreparably damaged in their business. They claim that the bribery charged consists of the payment of weekly benefits and transportation to

their new employees by appellees' union, and the payment directly to one William Wilde, an employee of one of the appellants, the sum of $140 to leave not only his employment but the city of Richmond.

Bribery is not only unlawful, but criminal, and when resorted to with a malicious purpose to injure a third party in his business, property, or personal liberty it would unquestionably afford ground for equitable interposition by injunction, if practiced in such a manner and to such extent that the party injured, or intended to be injured, could not obtain an adequate remedy at law for his injuries; but we have not been cited to any case, nor have we been able to find a case, which holds that the payment of weekly benefits or transportations, etc., to members of a labor union is *per se* bribery. It is the rule of such unions to pay weekly benefits, transportation, etc., to members, and that when a person becomes a member of the union he also becomes entitled to these benefits. It seems to have been the rule of the union, as old as the union itself, and was therefore not put in force because of this strike. It is, of course, one of the inducements held out to non-members to become members of the union, and is doubtless used as one of the arguments to induce persons to join the union, and it is the rule governing like associations, such as secret orders, beneficial societies, etc., and we have seen it nowhere questioned that such union or society have the right to make and carry out such a rule in the government and control of their union or society. When one becomes a member of such a union he becomes entitled to the benefits given by the union, and if he receives any of them the giving or taking of such benefits clearly could not be characterized as bribery.

But appellants contend that appellees paid to one William Wilde the sum of $140, as a bribe, with the malicious intent

to annoy, molest, and injure one of appellants in whose employ Wilde then was, the bribe being paid as an inducement to quit his employment and leave the city of Richmond. To sustain this charge four affidavits made by Wilde were offered by appellants. These affidavits are not only contradicted and discredited by a number of other affidavits read on behalf of appellees, but they contradict and discredit themselves. In Nos. 1 and 2 he makes various charges against members of the union, the sum and substance of which is that certain members of the union approached him, offering to pay him a money consideration to quit his employment and leave the city of Richmond, and that after much discussion he did receive from the uinon the sum of .$140 and agreed to leave the city of Richmond; while in his affidavit No. 3 he swears that on the 14th of October, 1905, he made a certain proposition to certain gentlemen of the city of Richmond, members of the union, that if they would advance him a certain sum of money he would leave the city, as it was not his intention to remain in the city, and did not have the requisite funds to get away. He further says in that affidavit, "I made the first advancement to said gentlemen without any solicitation on their part." His affidavit No. 4 is of little or no importance, since it merely states that he became uneasy and frightened by reason of what he had seen in the Richmond newspapers touching the receipt by him of the $140 from the union, which he had not returned, and he visited the office of one of the attorneys for appellees, where the matter was discussed, the result of which was that he determined to leave the city. In his affidavit No. 2 he deliberately states that he and one of appellants entered into an agreement that he was to get as much money out of appellees' union as he could in order to get clear and positive proof of the illegal means used by the union to carry on their business, and that for that reason

he consented to take the $140 and sign a paper to leave Richmond. This plan of Wilde to obtain money from the union is shown to have been known to one or more of appellants, and under these circumstances, and considering the conflicting and contradictory features of the affidavits he has made, and the admissions of bad faith he also makes, we take the view, as did the learned judge below, that his statements are entitled to little or no consideration in the determination of this controversy.

It would be impossible for us to review in detail the other affidavits in the case, numbering seventy or more. Suffice it to say with reference to the charge of picketing, that the most that has been shown by the affidavits is that by the patrols or pickets of appellees' union seen near the printing establishments of appellants, some of appellants had reason to become vexed, but it cannot be said that the members of the union have by their numbers or by any threats or violence of gesture or language at or near appellants' printing establishments deterred any employee from working, or any person seeking employment with appellants, or either of them. On the contrary, from the proof, the members of the union and their patrol or pickets appear to have acted in a quiet and orderly way. It is true that some of the members of the union are shown to have followed some of appellants' employees to their homes or boarding-houses in their efforts to induce them to join the union, which was, of course, to result in their leaving their employment, but the conduct of these members of the union does not appear to have been in any way violent or threatening, and they only solicited interviews at the homes or boarding-houses of these employees, which appear to have been usually granted.

It is true that a personal difficulty between one of the appellees, E. W. Blakey, and the William Wilde of whom we have spoken, is shown to have taken place after the "strike," but

when the facts and circumstances out of which the difficulty arose are considered, clearly the union or its members, other than Blakey himself, were in no way responsible for what then occurred. It seems that the $140 was paid by Blakey to Wilde for the latter's transportation to Canada, to which place he had stated he wished to go, and not having left the city of Richmond, nor returned the money, Blakey demanded of him the return of the money, but Wilde refused to return the money, and demanded $150 more; whereupon Blakey became angry and abused Wilde, but did not strike him. The abuse of Wilde was not because he was a non-union man, nor because he was in the employ of one of appellants, but because Blakey thought that Wilde's refusal to return the money, under the circumstances, was the equivalent of obtaining money under false pretenses, and in effect so told him. For Blakey's use of abusive language to Wilde on that occasion he was afterwards punished in the police court by a fine, and there the matter seems to have ended.

The evidence, we think, fails to make a case showing that appellees have in any way so molested, annoyed or damaged the appellants in the conduct of their business as to entitle them to the extraordinary relief by injunction. We are of opinion, however, that while the injunction of October 21, 1905, should, as the record stood, have been dissolved, it was entirely proper to continue the cause on the docket with the right to appellants to move for further injunctions *pendente lite,* and reserving to them the right to such relief as they might show themselves entitled upon a final hearing.

This being the effect of the decree under review, it will be affirmed.

*Affirmed.*