ROCKY MOUNTAIN BELL TELEPHONE CO. v. MONTANA FEDERATION OF LABOR et al.

(Circuit Court, D. Montana. August 7, 1907.)

No. 838.

1. INJUNCTION—PARTIES.

In a suit for an injunction to restrain certain voluntary labor organizations and officers and members of the same from interfering with the business of complainant, where it is alleged in the bill that the acts complained of were committed pursuant to a conspiracy entered into between the members of such organizations, it is not essential that all of such members be made parties.

2. COURTS—JURISDICTION OF FEDERAL COURTS—AMOUNT IN DISPUTE.

In such a suit the amount in dispute for the purpose of determining the jurisdiction of a federal court is the value of complainant's right to conduct its business, and an allegation in the bill that complainant will be damaged by the acts of defendants in a sum exceeding $2,000 is sufficient to confer jurisdiction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 890, 897.]

**8.** Injunction — Grounds — Unlawful Interference with Complainant's Business.

During a strike of the local employés of complainant telephone company, the members of certain labor organizations, defendant, by concerted action, issued and distributed and posted different circulars for the expressed purpose of inducing patrons of complainant to withdraw their patronage, and of preventing persons from entering its employ, unless it would accede to the demands of the strikers. Such circulars characterized complainant as "unfair," as a "legalized highwayman," and its employés as "scabs." They exhorted people not to patronize it, and stated that the members of the organizations had voted to give their patronage only to certain firms because others had refused to stop using complainant's telephones. *Held*, that such acts established an unlawful conspiracy to interfere with and destroy the lawful business of complainant, and that complainant was entitled to an injunction to restrain defendants prosecuting the object of the conspiracy by such methods.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 108, 109, 174, 175.]

## In Equity. On motion for temporary restraining order.

This is an application for a restraining order, to restrain the respondents, and each of them, and their officers, servants, and employés, and all persons acting through or under them, from interfering with or obstructing the transaction of the business of the complainant, the Rocky Mountain Bell Telephone Company, in Livingston, Mont., or from persuading others so to interfere, or from interfering with any person who may desire to enter the employ of the telephone company, either by threats, personal violence, abuse, intimidation, or any other means calculated or intended to interfere with the business of the complainant, or from inducing any person to leave the employ of the company in the city of Livingston; from boycotting the telephone company by the circulation of banners, or the posting or distributing of handbills or circulars containing opprobrious or injurious epithets against complainant; from interfering with, intimidating, boycotting, molesting, or threatening in any manner the patrons and customers of complainant, or any other person or persons, with the purpose of inducing them not to do business with the complainant; from giving directions to committees, associations, or otherwise, for the performance of any act or threat mentioned, or in any manner obstructing or interfering with the regular operations and conduct of the business of the complainant; and for such other and further relief as shall be equitable and right.

Complainant is a telephone company doing business throughout Montana. It is alleged that respondents are voluntary unincorporated associations of persons, and that Fairgrieve, Smith, Thorpe, and others mentioned are officers of the respective respondent associations. The bill alleges that the telephone company employs many operators in Livingston, and that about March 1, 1907, many of the employés demanded higher wages, and that, when the company refused to comply with the demand, many of the employés left the service of the complainant and refused to work for it. It is alleged that the Montana Federation of Labor, Livingston Trades & Labor Council, and Telephone Operators' Union No. 42 are voluntary associations, and that their proceedings are secret; and that in March, 1907, they conspired, co-operated, and combined to compel complainant to accede to the demands of its employés, and that, in pursuance of such conspiracy and combination, and for the purpose of boycotting the complainant and its business, and with the unlawful design of inducing the patrons and customers of complainant to withdraw from it their custom and patronage, and to interfere with and ruin the business of the complainant, they caused to be printed handbills or circulars, the substance of which is hereinafter referred to. It is alleged that, by solicitation and persuasion and intimidation and threats, many of the patrons of the complainant were compelled to stop using the Rocky Mountain Bell telephones, and that the respondents are attempting to persuade and compel employés to leave the service of complainant, and that, by reason of the acts of the respondents, great damage and injury have been done to the complainant; and that respondents

threaten to continue to do the unlawful acts complained of unless enjoined by the court.

A number of affidavits were filed by complainant supporting the allegations of its bill, and certain affidavits were filed by the defendants denying the facts alleged in the bill. The matter came on for hearing, and, after the defendant Thorpe had testified in his own behalf, the court ordered the action dismissed as to him, but granted a restraining order as to all other defendants.

H. G. McIntire and S. H. McIntire, for complainant.
T. J. Walsh, C. B. Nolan, and W. T. Pigott, for defendants.

HUNT, District Judge (orally, after stating the facts as above). While I have looked at the books that were cited yesterday by both sides, I do not at this time pretend to enter elaborately into the question that is presented by the application and the questions that were argued, as I have really not had time to do so, as much as I should like to have taken it, and I am considering the matter only with a view to the exercise of the discretion that rests in the court to grant a temporary restraining order. The whole question relates to the power of a court of equity to restrain defendants, who are charged with interfering with the business of a corporation, with regard to the right of molestation and of boycott.

Incidentally, counsel raised a question as to the citizenship of some of the parties, and I find that, in the case of Hopkins et al. v. Oxley Stave Co., 83 Fed. 912, 28 C. C. A. 99, which is analogous to this, the question of jurisdiction was considered in awarding an injunction, and, when the point was raised, Judge Thayer answered it in this way:

"The first proposition contended for by the appellants is that the trial court acted without jurisdiction in awarding an injunction. The ground for this contention consists in the fact that in the bill, as originally filed, two persons were named as defendants who were citizens and residents of the state of Missouri, under whose laws the Oxley Stave Company was incorporated. But as the case was dismissed as to these defendants and as to the two voluntary unincorporated associations, and as to all the members thereof who were not specifically named as defendants in the bill of complaint, before an injunction was awarded, and as the bill was retained only as against persons concerned in the alleged conspiracy who were citizens and residents of the state of Kansas, the objection to the jurisdiction of the court is, in our opinion, without merit."

There was a suggestion made as to indispensable parties, to which I listened with a great deal of interest, and I find that Judge Thayer discussed that matter in the same case, saying:

"It is further urged that the trial court had no right to proceed with the hearing of the case in the absence of any of the persons who were members of the two voluntary organizations, to wit, the Coopers' Union, No. 18, and the Trades Assembly of Kansas City, Kan., because all the members of those organizations were parties to the alleged conspiracy. This contention seems to be based on the assumption that every member of the two organizations had the right to call upon every other member for aid and assistance in carrying out the alleged conspiracy, and that an injunction restraining a part of the members from rendering such aid and assistance would necessarily operate to the prejudice of those members who had not been made parties to the suit. In other words, the argument is that certain indispensable parties to the suit have not been made parties, and that full relief, consistent with equity, can-

not be administered without their presence upon the record. We do not dispute the existence of the rule which the defendants invoke, but it is apparent, we think, that it has no application to the case in hand. The present suit proceeds upon the theory—without which no relief can be afforded—that the agreement entered into between the members of the two voluntary associations aforesaid is an unlawful conspiracy to oppress and injure the plaintiff company; that no right whatsoever can be predicated upon, or have its origin in, such an agreement; and that the members of the two organizations' are jointly and severally liable for whatever injury would be done to the plaintiff company by carrying out the object of the alleged agreement. The rule is as well settled in equity as it is at law that, where the right of action arises ex delicto, the tort may be treated as joint or several, at the election of the injured party, and that he may, at his option, sue either one or more of the joint wrongdoers. * * * We perceive no reason, therefore, why the case was not properly proceeded with against the appellants, although numerous other persons were concerned in the alleged combination or conspiracy."

The point was also made, incidentally, as to the amount involved. I find that the Court of Appeals of this circuit touched upon that matter in the case of Evenson et al. v. Spaulding et al. (C. C. A.) 150 Fed. 517, which was an appeal from an order granting an injunction pendente lite in a matter relating to a boycott and interference. The case was argued before Judges Gilbert, Ross, and Morrow; and Judge Gilbert, speaking for the court, said:

"It is earnestly contended that the court had no jurisdiction of the cause, for the reason that it did not appear from the bill that the requisite amount in controversy was involved. As we read the allegation of the amount in controversy, it is that the value of the matter in dispute exceeds $25,000, and that, in addition thereto, the appellees have been injured by the acts of the appellants in excess of the sum of $25,000. The statement of the amount involved is made under oath. It is not denied either by plea, answer, or by any affidavit. It is true that the bill does not set up the value of the appellees' business, or specifically allege the extent to which it will be damaged by the acts of the appellants; but it is clear from the averments of the bill that the matter in dispute, the value of which in the complaint is laid at more than $25,000, is the right of the appellees to conduct their business in the state of Washington. The bill sets forth the damages which have been sustained by the appellees within the few weeks prior to the commencement of the suit, and presents facts showing the extent of their business in the state of Washington which has been interfered with, and which will be interfered with in the future unless protected by injunction. A case in point is Butchers' & Drovers' Stockyards Co. v. Louisville & N. R. Co., 67 Fed. 35, 14 C. C. A. 290, in which Judge Taft, speaking for the Circuit Court of Appeals, said: 'The averment of the bill is that the injury and damage done to its business by the refusal of the railroad company to afford to it such transportation and shipping facilities is irreparable, and largely exceeds the amount of the sum of $2,000. The damage done by the refusal is to be estimated by the value of the right denied, and therefore the allegation that the damage largely exceeds $2,000 is inferentially a statement that the value of the right denied is largely in excess of $2,000. Even if this averment refers, as claimed by counsel, to damages sustained by complainant before the filing of the bill, it gives rise to the necessary implication that the subsequent permanent injury, unless enjoined, will exceed in pecuniary amount that already suffered, because the past damages only covered a period between the demand and the filing of the bill.' Other cases in point are Pennsylvania Co. v. Bay et al. (C. C.) 138 Fed. 203; Board of Trade of the City of Chicago v. Cella Com. Co., 145 Fed. 28, 76 C. C. A. 28."

I cite these cases merely as bearing upon some questions that were incidentally touched on yesterday. Now, we come to the merits of the matter. The averments of the bill make out a strong case against these defendants of an attempt to injure the business of complainant,

to interfere with others who desire to transact business with it, and to induce persons not to have business relations with it. It is charged in the bill of complaint that:

"For the purpose of boycotting your orator and its said business, and with the unlawful design and intention to induce the patrons and customers of your orator to withdraw from it their custom and patronage, and to interfere with and ruin the business of your orator, caused to be printed handbills or circulars, wherein the term 'unfair' and other opprobrious and injurious epithets were applied to your orator, copies of which said handbills or circulars are as follows, to wit:

" 'Don't Patronize

" 'The Bell Telephone Company. It is unfair to Montana Federation of Labor.

" 'The girls are on strike for living wages in the following places: Billings, Red Lodge, Livingston, Bozeman, Lewistown, and Great Falls.

" 'The company is offering inducements to "scabs" advertising in the papers to pay board and room in addition to wages. .

" 'Don't disgrace your sex. Keep away. We will win, or put the corporation out of business. We ask your help in this fight. Humanity demands it.' "

It cannot be successfully contended that that does not carry with it a threat to ruin the business of the corporation unless it yields to the demands made upon it for the payment of additional wages to certain of its employés. I believe it was intentionally and designedly framed to warn girls who might be desirous of entering the employ of the Bell Telephone Company. from seeking employment with or accepting employment from it. I believe that it was intended to intimidate, that it was calculated to intimidate, and that it would intimidate any girl of ordinary moral force. An extraordinary girl of unusual nerve, and of unusual pluck, might say that she would not care for that kind of a circular, and would not care whether she would be held up as a disgrace to her "sex," and would not care whether she would be declared "unfair" by an association, but that she would go to work.

Another of the circulars reads as follows:

"Attention!
"Citizens of Livingston and Vicinity!
"Patronize Home Industry!

"A dollar spent with a Home Institution is a dollar saved to the community. Don't send your money to foreign stockholders by patronizing a foreign corporation. The Home Telephone Company believe in paying wages to its employés, therefore it has agreed to pay to all girls in its exchange in Livingston $50 and $60 per month, a closed shop and 9 hours work. Don't be held up by legalized highwaymen."

I believe that is an express warning to persons not to permit themselves to become, patrons of a foreign corporation, characterized here as a "legalized highwayman."

Another circular reads as follows:

"To the Citizens of Livingston:

"Any person, persons, or firm, using the Rocky Mountain Bell Telephone, local or long distance. or patronizing them in any way, will thereby forfeit the patronage and support of organized labor of the city of Livingston."

That, of course, is intended to dissuade persons from transacting business with the Rocky Mountain Bell Telephone Company. It is

intended to frighten persons from carrying on business with that company; and it is a part of an apparent systematic attempt to coerce people into refraining from giving their patronage to the complainant.

Another circular reads:

"To Organized Labor and All Sympathizers:

"The Business Men's Association has organized for the purpose of fighting organized labor of the city of Livingston and vicinity, and also refuse to stop using the Bell long distance telephone."

That, of course, is but confirmatory, so far, of the only construction that can be put upon the circular just heretofore read. The circular continues as follows:

"Therefore, we, the members of Trades and Labor Council and all affiliated unions in the city and vicinity have seen fit to take the following action to further the interests of organized labor, such action as follows: That we throw all of our patronage to the following firms only," etc.

The defendants did not undertake to say that they would throw their patronage to the following firms, but to the following firms only, thus discriminating invidiously against those firms that continued to use the Bell long distance telephone. The more that one reads these circulars, the more the conclusion becomes irresistible that they were prepared in the interest of an association of persons whose purpose at that time was to boycott the telephone company, and to coerce it, in so far as possible, into the payment of certain wages to certain of its employés, and to frighten persons from accepting employment with it.

The affidavit of Mr. Fairgrieve does not deny that these posters were circulated. He says, however, that they were posted with no intent other than to "compel or induce, by persuasion in the shape of oral communications, and written and printed handbills and 'dodgers,' said company to pay to the women and linemen in its employ at Livingston, and in the vicinity of that town, such wages as would permit said women and linemen to live without becoming county charges or paupers, and that the purpose and intent of defendants was, and has been, and is now, to adopt and pursue all lawful means, to the end that said company shall pay to such women and linemen a living wage, to wit, a wage equal to that paid by said company to its women and linemen at Helena and in the vicinity of that city." The affidavit further states that the defendants, "without any malicious design or intent, proceeded to persuade and induce persons generally from becoming operators or linemen in Livingston and vicinity." Observe that there is impliedly an admission that the purpose of the circulars was to prevent persons from entering into the employ of the telephone company. Continuing, the affidavit reads that the defendants "attempted, by means which the defendants believed to be lawful"— that is just where the fundamental error lies—"to induce others to desist from patronizing or having business relations with complainant at Livingston, or with any other person or company patronizing complainant at Livingston; that some of the defendants, in pursuance of its said purpose, posted, or caused to be posted and circulated, the handbills or 'dodgers' mentioned in the bill of complaint, and affiant states that the matters contained in said handbills or 'dodgers' were

and are true, and stated the conditions existing." That is to say, that the complainant company is a "legalized highwayman," that it is employing those whom defendants designate as "scabs," and that it is "unfair," and that it should not be patronized by persons in Livingston who are in sympathy with the association, of which Mr. Fairgieve is an officer and member. Continuing, the affidavit reads:

"That the defendants at no time used any force or fraud in the effort to accomplish the purposes stated; that as soon as complainant shall pay to its operators and linemen in Livingston and vicinity the wages which it should pay, as hereinbefore stated, defendants will cease any opposition to complainant, and withdraw its dodgers and ask all the friends of labor to resume business relations with it at Livingston and vicinity; that the sole purpose and intent on the part of defendants, or any of them, in circulating and posting said 'dodgers,' was to advance, as far as they could, in good faith, the cause of the laboring men and women of organized labor."

So that, taking the affidavit of Mr. Fairgrieve, and the other corroborative affidavits, which are only material in so far as they affirm the view taken by Mr. Fairgrieve, it puts the case in a position where it is admitted that these circulars were posted; that defendants' intention was to dissuade people from entering into the employ of the complainant company, and to compel, so far as they could, the payment of certain wages to the operatives, and it is stated, further, that, if the company will consent to pay the wages demanded, then opposition will be withdrawn. Thus we have a combination, an admitted combination, or association of individuals existing and moving towards an end, which, as I have indicated before, is the interference with the business of the complainant company by preventing patrons from patronizing it, or operatives from entering into its employ, and holding it up to opprobrium as a "legalized highwayman."

It is now necessary to look into the question whether such a combination is forbidden by the law, and whether or not a court of equity will reach out and prevent a continuance of such methods by serving an injunction process against persons guilty of the acts. One of the most interesting cases I have been able to find in the few hours I have devoted to the study of the case is that of Callan v. Wilson, 127 U. S. 540, 8 Sup. Ct. 1301, 32 L. Ed. 223, decided by Justice Harlan 20 years ago. Callan was charged with conspiracy, and he was taken before a police magistrate in the District of Columbia, and committed to jail. He applied for a writ of habeas corpus, upon the ground that he was unlawfully deprived of his liberty in violation of his constitutional rights; the principal point being that a conspiracy was an offense of so high a nature that he had a right to trial by jury, and that the police court exceeded its jurisdiction when it imposed a fine upon him. This is the language of Justice Harlan:

"The information showed that one Franz Krause, Louis Naecker, August Naecker [and others] were during the months of July and August, 1887, residents of this district, each pursuing the calling of a musician; that during those months there was in the district an association or organization of musicians by the name of 'The Washington Musical Assembly, No. 4308, K. of L.,' containing 150 members, and a branch of a larger association known as 'The Knights of Labor of America,' extending throughout the United States, and having a membership of five hundred thousand persons, of which 10,000 were residents of this district; that during the period named Edward C. Linden,

Louis P. Wild, John S. Pistorio, James C. Callan (the appellant), Joseph B. Caldwell, George N. Sloan, John Fallon, Anton Fischer, and Frank Pistorio, were members of the said local assembly, each pursuing the calling of a musician; that on the 17th day of July, 1887, said local association imposed upon Franz Krause, one of its members, two fines, one of $25 and the other of $50, which he refused to pay upon the ground that they were illegal; and that said Linden, Wild, Pistorio, Callan, Caldwell, Sloan, Fallon, Fischer, with sundry other persons, whose names were unknown, did, on the 7th day of August, 1887 [just 20 years ago to-day], unlawfully and maliciously combine, conspire, and confederate together to extort from Krause the sum of $75 on account of said fines, to prevent the parties first above named—Krause, Naecker and others—and each of them, from pursuing their calling and trade anywhere in the United States; and to 'boycott,' injure, molest, oppress, intimidate, and reduce to beggary and want, not only said persons and each of them, but any person who should work with or for them, or should employ them or either of them. The information charged that the manner in which the defendants, so conspiring, proposed to effect said result, was to refuse to work as musicians, or in any other capacity, with or for the persons first above named, or with or for any person, firm, or corporation working with or employing them, to request and procure all other members of said organizations, and all other workmen and tradesmen, not to work as musicians, or in any capacity, with or for them or either of them, or for any person, firm, or corporation that employed or worked with them or either of them. and to warn and threaten every person, firm, or corporation that employed or proposed to employ the said persons, or either of them, that if they did not forthwith cease to so employ them, and refuse to employ them, and each of them, such person, firm, or corporation so warned and threatened would be deprived of any custom or patronage, as well from the persons so combining and conspiring as from all other members of said organization in and out of the district."

In this latter respect the case is quite close to the one under consideration. The information further charged that:

"On the 8th day of August, 1887, the said persons, among whom was the appellant, in execution of the purpose of said conspiracy, combination and confederation, sent and delivered to each member of 'The Washington Musical Assembly No. 4308, K. of L.,' and to divers others persons in the district, whose names are unknown, a certain printed circular of the tenor following:

" 'Sanctuary Washington Musical Assembly 4308, K. of L.

" 'Washington, D. C., August 8, 1887.

" 'Dear Sir and Brother: In accordance with a resolution of this assembly and in compliance with the constitution and by-laws of the order, you are hereby notified that the following named members of this assembly are hereby suspended for having performed with F. Krause, in direct violation of the official notice of said Krause's suspension from this assembly. You will, therefore, not engage or perform, directly or indirectly, with any of them.' "

Then follow the names of the parties. A demurrer was interposed, and was overruled, and the defendants requested a trial by jury. The request was denied, and a trial was had before the court, without the intervention of a jury, with the result already stated.

That part of the opinion which is material to this case is where Justice Harlan speaks of a conspiracy, and says:

"A conspiracy such as is charged against him [Callan] and his codefendants is by no means a petty or trivial offense. 'The general rule of the common law,' the Supreme Judicial Court of Massachusetts said in Commonwealth v. Hunt, 4 Metc. 111, 121, 38 Am. Dec. 346, 'is that it is a criminal and indictable offense for two or more to confederate and combine together, by concerted means. to do that which is unlawful or criminal, to the injury of the public, or portions or classes of the community, or even to the rights of an individual.' In State v. Burnham, 15 N. H. 396, 401, it was held that 'combinations against

law or against individuals are always dangerous to the public peace and to public security. To guard against the union of individuals to effect an unlawful design is not easy, and to detect and punish them is often extremely difficult.' Hawkins, in discussing the nature of conspiracies as offenses against public justice, and referring especially to St. 21 Edw. I, relating to confederacies to procure the indictment of an innocent person, says that, 'notwithstanding the injury intended to the party against whom such a confederacy is formed may perhaps be inconsiderable, yet the association to pervert the law, in order to procure it, seems to be a crime of a very high nature, and justly to deserve the resentment of the law.' So in Regina v. Parnell, 14 Cox C. C. 508, 514, it was observed that an 'agreement to effect an injury or wrong to another by two or more persons is constituted an offense, because the wrong to be effected by a combination assumes a formidable character. When done by one alone, it is but a civil injury, but it assumes a formidable or aggravated character when it is effected by the powers of the combination.' Tomlin says that 'the word "conspiracy" was formerly used almost exclusively for an agreement of two or more persons falsely to indict one, or to procure him to be indicted of felony,' but that 'now it is no less commonly used for the unlawful combinations of journeymen to raise their wages, or to refuse working, except on certain stipulated conditions.' * * * These authorities are sufficient to show the nature of the crime of conspiracy at common law. It is an offense of a grave character, affecting the public at large, and we are unable to hold that a person charged with having committed it in this district is not entitled to a jury, when put upon his trial."

Justice Harlan again had occasion to consider the matter in an opinion written by him on October 1, 1894, while he was sitting upon the Circuit Court of Appeals of the Seventh Circuit. The case was that of Arthur v. Oakes, 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414, heard by Justice Harlan, Judge Woods, and Judge Bunn; Justice Harlan delivering the opinion of the court, in which he used this language:

"The combinations or conspiracies which the law does not tolerate are of a different character. According to the principles of the common law, a conspiracy upon the part of two or more persons, with the intent by their combined power to wrong others, or to prejudice the rights of the public, is in itself illegal, although nothing can actually be done in execution of such conspiracy. This is fundamental in our jurisprudence. So a combination or conspiracy to procure an employé or body of employés to quit service in violation of the contract of service would be unlawful, and in a proper case might be enjoined, if the injury threatened would be irremediable at law. It is one thing for a single individual, or for several individuals each acting upon his own responsibility, and not in co-operation with others, to form the purpose of inflicting actual injury upon the property or rights of others. It is quite a different thing, in the eye of the law, for many persons to combine or conspire together with the intent, not simply of asserting their rights or of accomplishing lawful ends by peaceable methods, but of employing their united energies to injure others or the public. An intent upon the part of a single person to injure the rights of others or of the public is not in itself a wrong of which the law will take cognizance, unless some injurious act be done in execution of the unlawful intent. But a combination of two or more persons with such an intent, and under circumstances that give them, when so combined, a power to do an injury they would not possess as individuals acting singly, has always been recognized as in itself wrongful and illegal."

The matter is also discussed by Judge Thayer, in the case of Hopkins v. Oxley Stave Company, 83 Fed. 912, 28 C. C. A. 99, to which I have already referred. I have cited these cases because of the conspicuously high reputation the judges who wrote them bear, and because of the great respect that is paid them. Reading from the syllabus, this was a case where "the members of two labor organiza-

tions entered into a combination to compel a manufacturer of casks and barrels to discontinue the use of a machine for hooping the same. This object was to be accomplished by notifying the plaintiff's customers. and other persons not to purchase machine-hooped barrels, and by inducing the members of all labor organizations throughout the country, and persons who were in sympathy with them, not to purchase provisions or other commodities which were packed in machine-hooped barrels." After discussing the merits of the matter, Judge Thayer, speaking for himself and Judge Sanborn, Judge Caldwell dissenting, said:

"It is conceded that their purpose was to warn all of the plaintiff's immediate customers not to purchase machine-hooped barrels or casks, and to warn wholesale and retail dealers everywhere not to handle provisions or other commodities which were packed in such barrels or casks."

So in the case at bar we have a warning posted at Livingston. "This warning was to be made effectual by notifying the members of all associated labor organizations throughout the United States, Canada, and Europe not to purchase provisions or other commodities, and, as far as possible, to dissuade others from purchasing provisions or other commodities which were packed in machine-hooped barrels or casks. The object of the conspiracy, it will be seen, was to interfere with the complainant's business, and to deprive the complainant, and numerous other persons, of the right to conduct their business as they thought proper. To this end, those who were engaged in the conspiracy intended to excite the fears of all persons who were engaged in making barrels, or who handled commodities packed in barrels, that, if they did not obey the orders of the associated labor organizations, they would incur the active hostility of all the members of those associations, suffer a great financial loss, and possibly run the risk of sustaining some personal injury. It may be conceded that, when the defendants entered into the combination in question, they had no present intention of resorting to actual violence for the purpose of enforcing their demands; but it is manifest that by concerted action, force of numbers, and by exciting the fears of the timid, they did intend to compel many persons to surrender their freedom of action, and submit to the dictation of others in the management of their private business affairs. Another object of the conspiracy, which was no less harmful, was to deprive the public at large of the advantages to be derived from the use of an invention which was not only designed to diminish the cost of making certain necessary articles, but to lessen the labor of human hands. While the courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes, and have denied the power to enjoin the members of such associations from withdrawing peaceably from any service, either singly or in a body, even where such withdrawal involves a breach of contract, yet they have very generally condemned those combinations usually termed 'boycotts,' which are formed for the purpose of interfering, otherwise than by lawful competition, with the business affairs of others, and depriving them, by means of threats and intimidation,

of the right to conduct the business in which they happen to be engaged according to the dictates of their own judgments. The rights of an individual to carry on his business as he sees fit, and to use such implements or processes of manufacture as he desires to use, provided he follows a lawful avocation, and conducts it in a lawful manner, is entitled to as much consideration as his other personal rights, and the law should afford protection against the efforts of powerful combinations to rob him of that right and coerce his will by intimidating his customers and destroying his patronage."

We come, now, to some cases within the Ninth Circuit, of which this is a part:

Cœur d'Alene Consolidated & Mining Co. v. Miners' Union of Wardner et al. (C. C.) 51 Fed. 260, 19 L. R. A. 382, decided by Judge Beatty. The record in that case disclosed that the Miners' Union attempted to drive certain persons who were not members of their organizations out of the camps and gulches where the mining operations were conducted, and otherwise sought to intimidate them, and to deter them from working. Judge Beatty drew the distinction between what might be regarded as libel and what might be regarded as an attempt to interfere with a person's business by doing that which is subversive to the good order of a community. He said:

"A clear distinction will be observed between the two classes of cases above noted. In the one, when the acts complained of consist of such misrepresentations of a business that they tend to its injury, and damage to its proprietor, the offense is simply a libel; and in this country the courts have with great unanimity held that they will not interfere by injunction, but that the injured party must rely upon his remedy at law. On the contrary, when the attempt to injure consists of acts or words which will operate to intimidate and prevent the customers of a party from dealing with, or laborers from working for, him, the courts have with nearly equal unanimity interposed by injunction. In the one case it is an injury to a man's business by libeling it; in the other, by force, threats, and other like means, he is prevented from pursuing it; and, while the damage might be as great in one case as in the other, but most likely with different consequences to the good order and peace of the community, the courts have determined upon different remedies. What constitute such actionable threats or intimidations must be determined in each case from all the circumstances attending it. If the things done or the words spoken are such that they will excite fear or a reasonable apprehension of damages, and so influence those for whom designed as to prevent them from freely doing what they desire, and the law permits, they may be restrained, and the courts will look beyond the mere letter of the act or word into its spirit and intent."

Another case decided in this circuit is that of Loewe et al. v. California State Federation of Labor et al. (C. C.) 139 Fed. 71, and the following paragraph in the opinion of Judge Morrow is pertinent, particularly so in view of the posters, described in this case, that were put up at Livingston, and in view of the contention made by Mr. Fairgrieve in his affidavit:

"The defendants contend that the allegations of the bill of complaint and the supporting affidavits are insufficient to justify the court in issuing a temporary injunction; that it does not appear that any force, threat, or intimidation has been used by the defendants to enforce the alleged boycott against the product of complainant's factory; that all that has been done by the labor organizations named in the bill has been to urge upon the friends of labor to use their patronage for the benefit of labor; that they had the constitutional

right to do this, either by the publication of their views upon the subject or by communicating them orally to their friends and to the public generally. But can it be truthfully said that this is all that has been done by the defendants and those who have acted with them in enforcing the boycott described in the bill of complaint? Are they not doing something more than speak, write, and publish their sentiments? Are they not using the power of their combined numbers, acting in concert, to drive the complainants out of business and destroy their property, unless they are willing to surrender the control and management of their business to a labor organization? Are they not acting in combination, not merely for the ultimate purpose of advancing their own interests as workmen, but for the direct and immediate purpose of injuring the complainants in their business and property? If these questions must be answered in the affirmative—and upon the facts before the court they cannot be answered otherwise—then what follows? The weight of authority is that these acts are unlawful, and may be restrained by injunction."

In the case of Evenson v. Spaulding (C. C. A.) 150 Fed. 517, to which I have already referred, the Circuit Court of Appeals of this circuit touched upon the general doctrine applicable. "The affidavits," said Judge Gilbert, speaking for the court, "sufficiently sustained the allegations of the bill and the conclusion of the court below, and showed that the appellants were pursuing a systematic course of interference with the business of the appellees in peddling buggies and wagons in the state of Washington; that, as an agent of the appellees would go through the country taking in his train a number of buggies or wagons, the agents of the appellants would follow, generally in pairs, in order the better to watch, harass, and dog the steps of the peddler. Wherever the peddler would stop, the followers stopped; wherever he lodged, they lodged. As he started out in the morning, they were close in pursuit. Whenever he engaged in conversation with a customer, they would interrupt the conversation, and advise the customer not to buy, and, to 'prevent trouble,' the customer would often refuse to buy. The followers in every instance had no vehicles of their own to offer. Their declared purpose was to prevent the appellees' agents from making sales. The result was frequent personal altercations, and in one instance a fist fight. The appellees' agents were often intimidated. Some of the followers carried rifles, some of them had been made deputy sheriffs, and, in one instance, one of the appellees' agents was arrested by such a sheriff under the provision of a law which had been declared void by the superior courts of the state of Washington. The proof showed a practical destruction of the business of the appellees in the state of Washington, and that the purpose of the appellants, and it is not by them anywhere denied, was to continue in the course of action complained of. It is contended on behalf of the appellants that their acts were but the acts of competitors in business, and that they had the legal right to go upon the highways and engage in conversation with any one; and, in general, to do the acts which are complained of. This contention cannot be sustained. The association was a combination of men engaged in various lines of business. It had no property of its own save the money that was raised for the purpose of interfering with the appellees. It had not, nor had the majority of its members, any buggies or wagons for sale. * * * The appellants contend that their combination in itself was not unlawful, that no unlawful

means were used in furtherance of it, and that the damage to the appellees, if any they sustained, was the natural and unavoidable result of competition, incident to the carrying on of the appellants' business in a lawful manner. It is to be admitted that the appellees have no right to be protected against competition, and that the appellants have the right to push any lawful trade by all lawful measures and to keep and maintain the benefits thereof, and to exclude others from participation in it, if they can. But, while the appellees have no right to protection against competition, they have the right to protection against wanton and malicious interference and annoyance." The order granting an injunction pendente lite was affirmed.

The cases I have read well illustrate the views of the federal courts —the Supreme Court of the United States, the Circuit Courts of Appeals—and of the circuit judges and the district judges. It is true that some of the state courts do not take the same view, and yet I find that the Virginia Supreme Court of Appeals in the case of Everett Waddey Company et al. v. Richmond Typographical Union (decided March 15, 1906) 105 Va. 188, 53 S. E. 273, 5 L. R. A. (N. S.) 792, in a remarkably clear statement, used this language:

"A combination lawful within itself may become a conspiracy when the purpose in view is to ruin or damage the business of another, because of his refusal to do some act against his will or judgment; and accordingly it was held in the well-considered case of Doremus v. Hennessy, 176 Ill. 608, 52 N. E. 924, 54 N. E. 524, 43 L. R. A. 797, 802, 68 Am. St. Rep. 203, that all parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all overt acts illegally done in pursuance of such conspiracy and for the consequent loss, whether they were active participants or not. In that case, as in the cases we have cited above, it was held that, while the members of the labor union have the right to induce others, by persuasion and argument, to become members of their union, they have no right to insist that another person unite with them or fix his scale of prices as that of the union, and make his refusal a pretext to break up his business by inducing his customers to break their contracts and stop dealing with him. In the opinion it is said: 'No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation, or to threaten to do so for the sake of compelling him to do some act which, in his judgment, his own interest does not require. * * * Every man has a right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital, according to his own will; and any one who invades that right without lawful cause or justification commits a legal wrong, and, if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong."

It is fair to say, however, that in that case the court refused to issue an injunction upon the facts that appeared in the evidence.

I have read the case of Marx & Hass Jeans Clothing Co. v. Watson, 168 Mo. 133, 67 S. W. 391, 56 L. R. A. 951, 90 Am. St. Rep. 440, which was cited and read by counsel yesterday, and, with great respect to the learning of the distinguished court that rendered the opinion, I think they lost sight of some basic principles—some cardinal principles that underlie government itself. That is, while the right of free speech and to print or publish what one pleases is guaranteed by the Constitution, yet there is also guaranteed the right of an individual to carry on a lawful business in a lawful way, and

every constitutional guaranty is subject to the limitation that a man pursuing a business or enjoying his rights shall always be bound by the restraints of law. Unless that be the correct doctrine, liberty is but license, and the citizen is not bound by these restraints of law, which forbid license that ultimately leads to the subversion of government. There is no doubt whatever of the right of individuals to withdraw from working wheresoever they please. There can be no doubt of it. That is a cardinal basic principle; but there is another principle that is correlative: If there be the right to withdraw from the service of an employer, there is the right to work for an employer. The very same principle of liberty that guarantees the right in one instance protects the man in the enjoyment of it in the other. Whether a man be a union man, or whether he be a "scab"—whether he be a nonunion man—he has the right to work for whomsoever he pleases, and the law must protect the one as it must protect the other, in the enjoyment of his constitutional and inalienable rights. I cannot but think that the court in the Missouri case omitted to give full weight to these principles.

I have also read the case of Butterick Publishing Company v. Typographical Union No. 6, 50 Misc. Rep. 1, 100 N. Y. Supp. 292, cited by counsel. It does not agree entirely with the decision of the Supreme Court of Missouri; on the contrary, it draws a distinction between persuasion by proper means and that form of persuasion which carries with it intimidation, coercion, or illegal acts, and it recognizes, I think, those principles which uphold a man in the right of persuasion peaceably, and yet in his right to work.

In granting these orders, courts are confronted oftentimes by difficulties in reaching correct decisions. It may often happen that the facts render it hard to determine what is just and right to all parties concerned, but I think this case appeals much more strongly to a court of equity than a number of those which were cited in argument yesterday. And there is another rule, which is that a court of equity, in the exercise of its power, and a chancellor, in the exercise of his judicial discretion, may conform his rulings to the exigencies of a changing society, so that there can be no situation arising out of modern complexities which cannot be dealt with by a court of equity, provided a wrong has been done, and he who is entitled to the protection of the law comes into court and asks for that protection. I trust that, upon reflection, the parties concerned in this matter who have posted the bills, and who have written or printed the circulars or letters which have been referred to, will realize that their own rights as citizens may some time be invaded, and that they themselves may at some time ask the protection of a court of equity against invasion of their rights. If they do, the arm of the court will protect them, as it must now protect the complainant company in the enjoyment of its rights.

An order in compliance with these views may be prepared.